## Vandalia Railroad Company *v.* Stevens.

[No. 9,069.  Filed January 23, 1917.  Rehearing denied June 1, 1917.
Transfer denied March 22, 1918.]

1. CARRIERS.—*Carriage of Passengers.—Complaint.—Sufficiency.—
Relation of Carrier and Passenger.*—In an action against a rail-
road for personal injuries sustained by plaintiff while riding on
a miner's train, a complaint alleging that "plaintiff took passage
on one of defendant's said passenger trains upon said railroad,
to be carried" to a certain city, is sufficient as against a demurrer
on the ground that it did not show that plaintiff was a passenger
and such allegation is strengthened rather than weakened by a
further averment that plaintiff was required to pay only $1.50 a
month for passage.  p. 241.

2. APPEAL.—*Review.—Ruling on Demurrer.—Scope of Review.*—
The court on appeal, in reviewing a ruling sustaining a demurrer
to an answer is not limited to the objections stated in the memo-
randum accompanying the demurrer, but may consider, for the
purpose of sustaining the trial court's ruling, any defects fatal to
the sufficiency of the answer.  p. 247.

3. CARRIERS.—*Negligence.—Contracts Limiting Liability.—Force
and Effect.*—Although a common carrier cannot limit its com-
mon-law liability by any general notice, it may, by special con-
tract with the shipper, limit its liability as insurer, but in so far
as the special contract attempts to exonerate it from any loss
to which its own fault or negligence has contributed, it will be
treated as against public policy and void.  p. 252.

4. CARRIERS.—*Common Carriers.—Statute.—Scope.*—Section 5271
Burns 1914, §3925 R. S. 1881, prescribing the duty of railroads as
to running trains, etc., and making such companies common car-
riers, does not contemplate that every carriage of passengers and
goods undertaken by them under special contracts, and different
from that underetaken by, and required of, such companies, shall
be treated as common, rather than private carriage.  p. 253.

5. CARRIERS.—*Liability.—Limiting by Special Contract.*—A com-
mon carrier cannot, by words of its contract, convert itself into
a private carrier, where the transportation undertaken and the
duties and responsibilities incident thereto are such as are ordi-
narily incident to a common carrier, but whether in a particular
case the common carrier should be treated as a private carrier,
does not necessarily depend on whether a special contract was
entered into for the carriage, nor upon the wording or pro-

visions of the contract, but rather upon the nature and character of the carriage or transportation contracted for, and whether the duties and obligations flowing therefrom are those which the carrier owed to the individual contractor, as a common carrier or only those which it could be required to perform as a private carrier. p. 255.

6. CARRIERS.—*Carriage of Passengers.—Common Carrier.—Limitation of Liability by Contract.*—Where a railroad company ran a branch line from its main line to a coal mine and operated thereon regular passenger and freight trains, and the owner of the mine contracted with the railroad for exclusive daily carriage of the miners to and from work, they in turn agreeing with the mine owner that he could deduct $1.50 per month from their wages for such transportation, which was under the entire control of the railroad, the railroad was a common carrier of passengers, and not a private carrier, so that it could not by contract limit its liability as a common carrier. pp. 257, 261.

7. CARRIERS.—*Negligence.—Liability.—Limiting by Contract.*—Except in cases where a passenger is riding on a gratuitous pass, a common carrier of passengers cannot, by its contract, relieve itself from liability for its own negligence. p. 260.

8. APPEAL.—*Review.—Harmless Error.—Instructions.*—The giving of an instruction which is open to criticism, but the infirmities of which are not of a kind as would likely be prejudicial or harmful, is not a ground for a reversal in view of §700 Burns 1914, §658 R. S. 1881, inhibiting reversals for errors which are merely technical. p. 262.

From Knox Circuit Court; *Benjamin M. Willoughby,* Judge.

Action by Ira Stevens against Vandalia Railroad Company. From a judgment for plaintiff, the defendant appeals. *Affirmed.*

*Clarence B. Kessenger, Pickens, Moores, Davidson & Pickens, D. P. Williams* and *John G. Williams,* for appellant.

*William H. Hill,* for appellee.

HOTTEL, J.—This is an appeal from a judgment for $500, recovered by appellee in an action brought by him against appellant to recover for personal inju-

ries alleged to have been sustained by him while on a train operated by appellant, between the mine of the "Indian Creek Coal and Mining Company," where appellee was employed as a miner, and the city of Vincennes. The complaint is in one paragraph and proceeds upon the theory that appellee was a passenger upon appellant's train when injured, and that his injuries were caused by appellant's negligence. A demurrer to the complaint, accompanied by proper memorandum, was overruled, and such ruling is here assigned as error and relied on for reversal.

It is insisted that the averments of the complaint do not show that the relation of passenger and carrier existed between appellant and appellee at the time the latter received the injuries of which he complains.

The averments of the complaint necessary to an understanding of such question, and other questions hereinafter considered, are in substance as follows: Appellant owned and operated a railroad from Indianapolis to Vincennes, with branch roads or spurs leading off of such main line. One of such spurs left the main line between Bruceville and Bicknell in Knox county, and extended into the Indian Creek coal mine. In operating its main line and branches appellant owned and used thereon a number of locomotive engines and trains of cars, both freight and passenger, and operated passenger trains thereon drawn by its locomotive engines. On February 29, 1912, *"plaintiff took passage on one of defendant's said passenger trains upon said road, to be carried to the city of Vincennes, Indiana;* that he boarded said train at said Indian Creek coal mine; that for passage over said road from said * * * mine to * * * Vincennes * *, * plaintiff was required

to pay  *  *  *  $1.50 per month.'' Plaintiff board-
ed said train at said mine ''and entered the passen-
ger coach near the front end  *  *  *  about twelve
feet from the  *  *  *  stove  *  *  *; that the
agents of  *  *  *  defendant set the air brakes on
said coach and then uncoupled the engine  *  *  *
and  *  *  *  did some switching in and about said
mine; that said coach was left standing on a steep
grade  *  *  *; that by reason of deficient air-brake
equipment and deficient air connection the air brakes
on said coach became released; that upon the releas-
ing of said air brakes' said  *  *  *  coach and the
caboose coupled with it started to ·  *  *  *  run
down grade  *  *  *.'' Immediately upon the coach
starting to run down grade the engine which had
been used for switching was, by the agents of  *  *  *
defendant, run backward toward said  *  *  *  coach;
that said coach and caboose  *  *  *  collided with
*  *  *  said engine; that said collision caused
*  *  *  plaintiff to be thrown  *  *  *  about
twelve or fifteen feet to the heating stove  *  *  *
heated to a red heat,'' etc. (Our italics.)

As against a demurrer the italicized averments,
*supra,* make the complaint sufficient to withstand ap-
pellant's said objection. *Indiana Union Trac-*
1. *tion Co.* v. *McKinney* (1906), 39 Ind. App. 86,
78 N. E. 203; *Ohio, etc., R. Co.* v. *Craucher*
(1892), 132 Ind. 275, 31 N. E. 941; *Walther* v. *South-*
*ern Pacific Co.* (1911), 159 Cal. 769, 116 Pac. 51, 53,
37 L. R. A. (N. S.) 235.

We cannot agree with appellant's contention that
the effect of such averment is destroyed by the words
which follow, showing that appellee was required to
pay only $1.50 a month for such passage. The effect

of the latter averment is to strengthen rather than to weaken the former.

To said complaint the appellant filed an answer in three paragraphs, the first being a general denial.

The second paragraph is predicated on a contract entered into between appellant and the mining company by the terms of which the appellant *undertook to contract as a private carrier* to carry the employes of said mine from their homes at Vincennes to their place of work at said mine and return, with a proviso to the effect that appellant should not be liable for any damages to any employe on account of injury or death resulting to such employe, while on, or getting on or off appellant's said train, no matter how such injuries were caused. Said paragraph of answer avers that it was under and pursuant to such contract that appellee was on said train when injured; that appellee had paid appellant nothing for his passage; that the $1.50 paid by him, as averred in the complaint, was paid to the mining company toward the expense of running such train, and for the privilege of being carried thereon to and from his work. Said contract is made part of the answer and is as follows:

"Whereas, Indian Creek Coal & Mining Company, a corporation under the laws of the State of Indiana, owns and operates a coal mine located in Knox county, State of Indiana, on the Knox County Coal Branch of the Vincennes Division of the Vandalia railroad, and

"Whereas, said Indian Creek Coal & Mining Company has requested Vandalia Railroad Company, a consolidated corporation organized and existing under the laws of the states of Indiana

and Illinois, to furnish said Indian Creek Coal & Mining Company special facilities for getting miners living in the city of Vincennes and the immediate vicinity, and employed by said coal company, to and from said mine, and,

"Whereas, said Vandalia Railroad Company is not a common carrier of passengers for hire over said branch of its Vincennes division and does not operate any passenger trains thereon, and is not willing to do so, and,

"Whereas, said Vandalia Railroad Company is willing, in the capacity of private carrier, but not otherwise, to furnish, upon the terms and conditions hereinafter set forth, said Indian Creek Coal & Mining Company with the facilities desired by it for getting its miners to and from said coal mine;

"Now, therefore, this agreement made and entered into by and between said Vandalia Railroad Company, hereinafter designated Railroad Company, and said Indian Creek Coal & Mining Company, hereinafter designated Mining Company, witnesseth:

"1. In consideration of the premises and of the covenants and agreements hereinafter set forth to be by the Coal Company kept and performed; the Railroad Company in the capacity of a private carrier, and not otherwise, hereby covenants and agrees that it will, as soon as possible after the execution of this agreement, furnish the Coal Company a sufficient number of cars and an engine and train crew to haul and handle the same, and will run such engine and

cars as a train of the coal company between said city of Vincennes and said coal mine.

"A blue print, showing the route of said train between the points named, is hereto attached as an exhibit marked "A" and for the purpose of identification, is signed by the chief engineer of the railroad company and by the president of the coal company.

"Said cars shall be used by said coal company for the sole purpose of carrying miners employed by the coal company between the said city of Vincennes and its said coal mine.

"The Railroad Company will furnish to the coal company a sufficient number of cars to carry each working day the said miners employed at its said mine and will haul for the coal company said cars in a train, which shall leave the Union Station in said city of Vincennes in the morning of each working day and run to said mine and shall return from said mine to said Union Station in the afternoon of each working day, Provided, always, however, that said train shall not run on any day other than a working day and that said train shall not make more than one round trip each working day.

"2. In consideration of these premises the Coal Company hereby covenants and agrees to pay to the Railroad Company the sum of five hundred dollars ($500) per month for each and every month during the continuance of this agreement, provided, always, however, that if the number of persons on said train to or from said mine on said working day during any month exceeds five hundred (500) the coal company will

pay to the Railroad Company for that month an additional sum of one dollar ($1.00) for each person so handled in excess of five hundred, and provided further that no reduction for any cause whatever shall in any month be made from said monthly payment of five hundred dollars ($500).

"All sums which the coal company hereby agrees to pay to the Railroad Company shall be so paid on or before the fifteenth (15th) day of each month for the preceding month.

"3.   As a part of the consideration moving to the railroad company for its performance of this agreement and as an express condition thereof the coal company agrees that the railroad company shall not be liable in any event to any one for any damages claimed on account of personal injuries received by any one while being carried in said cars or while boarding said cars or alighting therefrom, nor for any death resulting from such injuries, nor from any loss of or damage to property that may be carried on said cars for said coal company, or for any of the miners riding in said cars, even though such injuries, loss or damage be caused by the negligence, gross or otherwise, of the railroad company or its employes but the coal company does not guarantee the non liability of the railroad company as above provided.

"4.   This agreement may be terminated at any time by either of the parties hereto giving to the other party three months' written notice of its intention to terminate the same."

The third paragraph of answer contains averments substantially the same as the second, and, in addition,

avers that after said contract had been entered into between appellant and the mining company, the appellee while in the employ of said mining company entered into a contract as follows:

"Miners Agreement and Release.

"In order to obtain the benefit of being carried to and from my work on a miners' train which Indian Creek Coal and Mining Company proposes shall be run between the city of Vincennes, Indiana, and the coal mine operated by that company on the Knox County Coal Branch of the Vincennes Division of the Vandalia Railroad for the joint accommodation of the Indian Creek Coal and Mining Company, and the men employed by it at said mine, I, the undersigned, hereby agree to contribute out of my wages one dollar and fifty cents ($1.50) per month toward the expense of running said train, to be retained by said Indian Creek Coal and Mining Company, and to assume all risk of personal injury or death, and all damage to or loss of property while riding on said train, or in boarding the same or alighting therefrom, and I hereby fully release and discharge said Coal Company and any other person, persons or corporation connected with or concerned in the running of said train from any and all liability for damages on account of my personal injury or death, or damage to or loss of property sustained while I am riding on said train or boarding the same or alighting therefrom, or resulting in any manner whatsoever from the running and operation of said train.

"Dated this 12th day of January, A. D. 1912."

A demurrer was sustained to each of these paragraphs of answer, and these rulings are assigned as error and relied on for reversal. A motion for new trial filed by appellant was overruled, and this ruling is also assigned as error and relied on for reversal.

In answer to appellant's contention that the court erred in sustaining the demurrers to each of its affirmative paragraphs of answer, the appellee urges the several objections to such answers stated in the respective memoranda accompanying each of said demurrers.

Either of said objections, or in fact any objection, though not contained in the memoranda, which is fatal to the sufficiency of such answers, is

2. available for the purpose of justifying the ruling of the trial court, sustaining such demurrers. *Bruns* v. *Cope* (1914), 182 Ind. 289, 296, 105 N. E. 471, 474.

One ground upon which appellee justifies such action of the trial court is that the respective contracts upon which such answers are based are against public policy and void. The disposition of the questions presented by this ground of objection to such answers, if in accord with appellee's contention, will not only render unnecessary a consideration of the other objections, but will also, in effect, dispose of all questions presented by the appeal except possibly an objection to one of the instructions.

Back of the question suggested, two questions are primarily involved, viz.: (1) The relation which appellant sustained to appellee, whether that of a common carrier or that of a private carrier; (2) the liability of such carriers generally and the extent to

which public policy will permit a limitation of such liability.

The latter question will be first considered. "The decisions of the courts as to the right of the carrier of passengers to limit his liability for the neglect of that care and circumspection which the law requires of him have followed almost the same course as those upon the right of the carrier of goods to guard himself by contract with the bailor against the consequences of his negligence; and the same diversity as to the validity of such contracts and the extent to which they may provide against the carrier's liability, when they are allowed, is to be found." 2 Hutchinson, Carriers (3d ed.) §1072, p. 1245. It follows that many of the cases herein cited and referred to are cases which discuss and define the right of such carriers in the matter of limiting liability for injury to, or loss of, goods received by them for transportation.

Originally, at common law, a common carrier was held liable for all losses which did not fall within the excepted cases of "the act of God or of the public enemy," while the bailee or private carrier was held liable only for the losses resulting from a neglect of ordinary care. *Davidson* v. *Graham* (1853), 2 Ohio St. 131, 134; *Railroad Co.* v. *Lockwood* (1873), 17 Wall. 357, 21 L. Ed. 627, and cases there cited.

The liabilities of a common carrier may be divided into two classes: one, the liability for losses by neglect, which is the liability of a bailee or private carrier; the other, a liability for losses by accident or other unavoidable occurrence. *Steele* v. *Townsend* (1861), 37 Ala. 247, 79 Am. Dec. 49; *Railroad Co.* v. *Lockwood, supra,* 21 L. Ed. 635.

The only elements necessary to create liability against the common carrier, under the common law as originally declared, was the delivery of the property to the carrier by the shipper, and a failure to deliver on the part of such carrier. The reason assigned for the peculiar duty and high responsibility thus imposed on such carriers was the public character of their employment, the extensive control which they exercised over the property carried, and the facilities at their command for securing immunity for a breach of their trust. In the first half of the eighteenth century the rigidity of this rule was somewhat relaxed, by the English courts, by certain innovations sanctioned by said courts, which permitted such carriers to limit their liability by notice, even though general, if brought to the knowledge of the shipper. These innovations became so frequent, and their evil consequences so manifest, that expressions of regret from many eminent judges, both of England and America, on account of the sanction given such innovations by the courts, will be found in the cases herein cited. To correct these evils Parliament, in 1854, passed the Railway and Traffic Act, the seventh section of which provides as follows: "That every railway company, canal company, and railway and canal company shall be liable for the loss of, or any injury to, any horse, cattle or other animal, or to any article, goods or things in the receiving, forwarding or delivering thereof occasioned by the neglect or default of such company or its servants, notwithstanding any notice, conditions or declaration made and given by such company contrary thereto, and that no special contract between such parties and any other parties in the premises shall be binding upon or affect such

party, unless the same shall: (1) Be reduced to writing; (2) Be signed by the owner or person delivering the animal or goods; and (3) Be adjudged by the Court or Judge before whom any question relating thereto shall be made, to be just and reasonable."

Since the passage of this act the English courts have generally held that by special contract *the common carrier* may exonerate itself from the responsibility of insurance, but *cannot free itself "from the obligation to use due care for the safe transportation and delivery of the animal or thing to be delivered."* *Railroad Co.* v. *Lockwood, supra,* and cases there cited.

The courts of this country generally refused to give sanction to the doctrine, announced by the English courts, which recognized that by a *general notice,* brought to the knowledge of the shipper, the common carrier might relieve itself from liability on the theory of the *implied assent* of the owner of the goods to the terms prescribed by such carrier in such notice (*Graham & Co.* v. *Davis & Co.* [1854], 4 Ohio St. 362, 377, 62 Am. Dec. 285, 289); but a different conclusion was reached in cases where the shipper expressly agreed to the limitation of liability and permitted it to be made a part of his contract of shipment. In such cases the great weight of authority in this country is not substantially different from that recognized and expressed by the English courts since the passage, by Parliament, of the traffic and transportation act referred to *supra;* that is to say, the courts now generally recognize that the shipper may, if he so desires, agree to any limitation of that part of a liability *designed for his security and affecting him alone.* However, as before indicated, "the common-law ex-

ception to the common carrier's liability, which exempts only those losses arising from the act of God, was well settled to include only those inevitable causes of loss into which no human agency could have entered." This left the carrier liable as an *insurer* for many losses, equally inevitable, and which no care or prudence on his part could have prevented. No one but the owner of the goods could have any interest in this liability; and as its renunciation had no tendency to relax the vigilance which such carrier owed to others, the owner was at liberty to surrender it. But he had no power to stipulate for what was immoral in its tendency, or to take from the carrier any of the motives to the faithful discharge of his public duty, and, consequently, could not relieve him from the consequences of his own negligence or carelessness.

"There is nothing in which the public have a deeper interest, than in the careful and prudent management of public conveyances, and no higher moral obligation, than rests upon those entrusted with the control of dangerous forces, to discharge their duties with care and skill. Upon it the safety of thousands of lives, and millions of property, daily depends.

"Now, one of the strongest motives for the faithful performance of these duties, is found in the pecuniary responsibility which the carrier incurs for the failure. It induces him to furnish safe and suitable equipments, and to employ careful and competent agents. A contract, therefore, with one to relieve him from any part of this responsibility, reaches beyond the person with whom he contracts, and affects all who place their persons or property in his custody. It is immoral, because it diminishes the mo-

tives for the performance of a high moral duty; and it is against public policy, because it takes from the public a part of the security they would otherwise have." *Graham & Co. v. Davis & Co., supra; Davidson v. Graham, supra; Railroad Co. v. Lockwood, supra,* 21 L. Ed. 627, 632.

An examination of these cases and those referred to therein will show that the great weight of authority in this country, Indiana included, is to the ef-3.   fect that, whatever doubt may have once been entertained on the subject, it is now well settled that, although a common carrier cannot limit the liability which the common law devolves on him, by any general notice, he, by special contract with the shipper, may limit his liability as an insurer, and thereby exonerate himself from responsibility for losses arising from causes over which he has no control, but in so far as his special contract attempts to exonerate him from any loss to which his own fault or negligence has contributed, it will be treated as against public policy and void. *Graham & Co. v. Davis & Co., supra; Davidson v. Graham, supra; Michigan, etc., R. Co. v. Heaton* (1871), 37 Ind. 448, 10 Am. Rep. 89; *Adams Express Co. v. Fendrick* (1871), 38 Ind. 150; *Terre Haute, etc., R. Co. v. Sherwood* (1892), 132 Ind. 129, 31 N. E. 781, 17 L. R. A. 339, 32 Am. St. 239; *Indianapolis, etc., R. Co. v. Forsythe* (1892), 4 Ind. App. 326, 29 N. E. 1138; *Reid v. Evansville, etc., R. Co.* (1894), 10 Ind. App. 385, 35 N. E. 703, 53 Am. St. 391.

As before indicated, the liability upon which appellee's action is predicated is alleged to have resulted from appellant's negligence. The action sounds in tort and not in contract. The liability of

an insurer is not involved. It follows that the contracts upon which said answers are based constitute no defense to appellee's cause of action, if, in fact, the appellant sustained toward the appellee, at the time of his injury, the relation of a common carrier, rather than that of a private carrier.

It is conceded by appellee that public policy is not involved in contracts of this character when entered into between a passenger and a private carrier, and that the limitation of liability here involved is legal and valid if the contract is to be construed as one between a passenger and a private carrier. In this connection see *Louisville, etc., R. Co.* v. *Keefer* (1896), 146 Ind. 21, 34, 44 N. E. 796, 38 L. R. A. 93, 58 Am. St. 348; *Pittsburgh, etc., R. Co.* v. *Mahoney* (1897), 148 Ind. 196, 200, 46 N. E. 917, 47 N. E. 464, 40 L. R. A. 101, 62 Am. St. 503, and cases cited; *Cleveland, etc., R. Co.* v. *Henry* (1907), 170 Ind. 94, 99, 100, 83 N. E. 710.

We next address our inquiry to this phase of the question. It is insisted by the appellant that the contracts under consideration, by their express terms, show that appellant contracted as a private carrier and not as a public carrier, and that the cases just cited, involving similar contracts between public carriers and express and show companies, are conclusive of the question involved, and in favor of appellant's contention that its contract is valid.

On the other hand, it is contended by appellee, in effect, that railroad companies are, in Indiana, made common carriers by statute (§5271 Burns 1914,

4.    §3925 R. S. 1881; *Pennsylvania Co.* v. *Clark* [1891], 2 Ind. App. 146, 151, 27 N. E. 586, 28 N. E. 20) and that they cannot, by the form of their

contract, make themselves private carriers, that the instant case is not different from those involving a a drover's pass, and should be controlled by those cases. *Ohio, etc., R. Co. v. Selby* (1874), 47 Ind. 471, 17 Am. Rep. 719; *Louisville, etc., R. Co. v. Faylor* (1890), 126 Ind. 126, 25 N. E. 869; *Lake Shore, etc., R. Co. v. Teeters* (1905), 166 Ind. 335, 77 N. E. 599, 5 L. R. A. (N. S.) 425; *Pittsburgh, etc., R. Co. v. Brown* (1912), 178 Ind. 11, 97 N. E. 145, 98 N. E. 625.

We first consider appellee's contention. While expressions may be found in some jurisdictions having statutes somewhat similar to our statute, *supra* (see *Walther v. Southern Pacific Co., supra,* and cases there cited) lending support to appellee's contention, and while our statute must be treated as conclusive of the character of the relation sustained by railroad companies and the public generally in the matter of the business of transportation of freight and passengers as usually carried on by, and required of, such companies under the general rules and regulations controlling them, yet we do not understand that by such statute the legislature intended that each and every carriage of passengers and goods, undertaken by such companies under special contracts, and different from that usually undertaken by, and required of such companies, should be treated as a common carriage rather than a private carriage. It may be added, also, that the facts appearing in the complaint and answers in this case are such as to distinguish it from the cases, *supra,* involving drovers' passes.

On the other hand, we cannot agree with the appellant's contention, that the common carrier may, by the words of its contract, convert itself into a private carrier, where the transportation undertaken

and the duties and responsibilities incident thereto are such as are ordinarily incident to a common carrier, and we are also of the opinion that the facts appearing in this case distinguish it from the cases involving injuries to express messengers and show employes, cited *supra.*

"A common carrier may, however, undoubtedly become a private carrier or bailee for hire, when as a matter of accommodation or special engagement, he undertakes to carry something which it is not his business to carry"; but whether in the particular case the common carrier should be treated as private carrier, does not necessarily depend on whether a special contract was entered into for the carriage, nor upon the wording or provisions of such contract, but rather upon the nature and character of the carriage or transportation contracted for, and whether the duties and obligations flowing therefrom are those which such carrier owes to such individual contractor as a common carrier, or only those which such carrier could be required to perform as a private carrier. 1 Hutchinson, Carriers (3d ed.) §44; *Cleveland, etc., R. Co.* v. *Henry, supra,* 99; *Parrill* v. *Cleveland, etc., R. Co.* (1899), 23 Ind. App. 638, 652, 55 N. E. 1026; *Terre Haute, etc., R. Co.* v. *Sherwood, supra,* 134; *Railroad Co.* v. *Lockwood, supra.*

The business of common carriage by rail, while it contemplates the carriage of persons and property generally, yet it also contemplates that such passengers and property will be carried on trains made up by the carrier, and entirely under its supervision and control and subject to the usual and ordinary regulations governing such transportation. It is no part of the duty of a common carrier, as such, to carry

the property of shippers in their (the shippers) cars, with the shippers in charge, at such times as the shipper demands, nor are such carriers required to give to the shipper any particular car for goods to be carried with an agent of the shipper in charge.

The express messenger cases and show employe cases, cited *supra,* are cases where the shipper demanded and was given a carriage and transportation entirely different from that extended to the shipping public generally. The express company in those cases asked and obtained a combined carriage of property and the agent in charge thereof and demanded and obtained space for such carriage in a particular car, and obtained privileges in connection with such transportation which are not demanded by, or given to, the ordinary shipper.

While the express company is itself a common carrier, and owes to the public the duties of such a carrier, it cannot demand or obtain from another common carrier, transportation of its property, different from that which the other carrier owes to the shipping public generally, except by special contract for the special carriage desired. Such carriage has always been by special contract, and has likewise been recognized as private carriage rather than common carriage. *Louisville, etc., R. Co.* v. *Keefer, supra,* and cases cited; *Express Cases* (1885), 117 U. S. 1, 6 Sup. Ct. 542, 628, 29 L. Ed. 802.

So, also, with the show cases, *supra.* The transporation was a mixed transportation of property and persons, in cars owned by, and under the supervision, management and control of the show company. It is a kind of transportation which the railroad company

does not owe to, and which is not given to the public generally.

In such respects, the express messenger cases and the show employe cases are wholly different from the instant case. In the instant case, the branch line of road over which the train in question was being operated when appellee was injured was appellant's own line of road. It was a branch run by it to said mines. It was used by appellant in connection with its business as a common carrier for the transportation of the product of said mines. In this connection, we suggest the query whether, by a proper proceeding before the Public Service Commission, appellant might not have been required to furnish transportation over its said branch to the workers in said mine, but whether this be so or not, we need not and do not decide. Appellant did furnish such transportation. As a common carrier operating such branch road and engaged in hauling and transporting over such branch road the products of said mines, appellant was, as such common carrier, interested in having said mines operated, and hence interested in seeing that the miners who operated such mines were provided with a means of transportation to and from their work. Under these circumstances, appellant furnished such transportation. The contract under which such transportation is furnished is not a contract for mixed transportation, or for transportation over the shipper's road, or of the shipper's employes and property in the shipper's car, or for space in a particular car, but is a contract to carry passengers only, in appellant's own cars, over its own road, operated by its own

men, for a consideration to be governed by the number of passengers carried. Appellant's business is that of a common carrier, and in the instant case it had complete, undivided and unrestricted management, control and direction of every element that entered into such transportation, including road, roadbed, cars, locomotive and all employes connected with the operation, of such train, and hence it was responsible for and had the power to control and guard against every element of negligence which might expose such passengers to any danger that might be avoided by the exercise of that high degree of care, which the law in such cases imposes on the common carrier. For a court, under such circumstances, to permit such a carrier to avoid the obligations and duties of a common carrier, on the ground that in the particular instance it had contracted as a private carrier, in our judgment, would be the equivalent of the court's giving its sanction and approval to evasion.

The passengers to be carried were not in the cars of the mining company, nor were they in charge of any property of the mining company in such cars, and had nothing to do with the management or control of said cars or any property therein. Indeed, appellee, when he entered said car, was not then in the service of the mining company. His day's work at the mine began after leaving appellant's car in the morning, and ended before entering it in the evening. He entered the car as appellant's passenger, and not as the mining company's employe to take charge of its property or to perform any service for it. His relation to appellant bore no resemblance to that of one of its employes, as in the express messenger cases.

*Bates* v. *Old Colony Railroad* (1888), 147 Mass. 255, 267, 17 N. E. 633.

Transportation of himself was the only object for which appellee entered appellant's train. His employment at the mine may have made necessary the transportation, but when he entered the train he did not do so as the employe of the mining company, nor to do any service for it. Omitting any words which tend to obscure, rather than illuminate, the real character and purpose of the contract, neither it nor the transportation provided for therein contained any element not common to any transportation of passengers by a common carrier, except that such contract is for transportation between a regular station and a mine, instead of between regular stations, and the mining company acted as an intermediary for the making of the contract, and the collecting of the fares. These elements are, in our judgment, of little importance in determining whether, as to such contract, appellant should be regarded as a common carrier. They might with equal propriety be inserted in any contract for passage on excursion trains run to some point other than a passenger station and arranged for by any one other than the carrier. Mr. Hutchinson closes the paragraph of his work, from which we quoted above, with the following words: "But it may now be stated to be the decidedly prevailing doctrine in this country that *a passenger carrier cannot contract against the consequences of his own negligence when the carriage of the passenger himself is the subject of the contract.*" 2 Hutchinson, Carriers §1072, pp. 1245, 1246.

Our examination of the cases herein cited, as well as many others, confirms this statement, unless it can

be said that the acceptance of a *gratuitous pass*
7.   is a contract within the meaning of that word
as above used.

Many jurisdictions, Indiana included, hold that one
who accepts a gratuitous pass, accepts with its benefits its burdens also, including a release of liability
for injury resulting from the carrier's negligence.
*Payne* v. *Terre Haute, etc., R. Co.* (1901), 157 Ind. 616,
62 N. E. 472, 56 L. R. A. 472; *Indianapolis Traction,
etc., Co.* v. *Klentchy* (1906), 167 Ind. 598, 79 N. E. 908,
10 Ann. Cas. 869; *Malott* v. *Weston* (1912), 51 Ind.
App. 572, 98 N. E. 127; 6 Cyc 579, and cases cited
under note 53.

This is the only class of cases which we have been
able to find where a limitation of liability was allowed
to defeat an action for injuries caused by the carrier's negligence, where the contract for carriage was
with a common carrier for passenger carriage only,
and the means of carriage, including road, cars, locomotive power and those operating the train, were under the complete supervision and control of such carrier.   And, when we take into account the fact that
the only contract upon which the passenger bases his
right to be upon the train, in such a case, is gratuitous,
and consider the reasoning upon which these cases
are based, it is doubtful whether they can be said to
constitute an exception to the doctrine, *supra,* announced by Hutchinson.   There is no hardship in this
doctrine, and many strong reasons unite to commend it.

That there is strong reason that such should be the
holding of the courts is found in the expressions of
regret of various eminent judges, before referred to
in connection with the innovations permitted in the

common-law rule.   Upon this subject, the
6.   court, in the case of *Baker* v. *Brinson* (1855),
     9 Rich. (S. C.) 201, 202, said: "The exacting
tendencies of certain great carriers of the present
day, enjoying facilities that almost exclude competi-
tion, admonish us, in the application of these whole-
some rules, carefully to guard against any abuses.
Notwithstanding their apparent rigor, there is a salu-
tary policy in these common-law doctrines, and those
who are called to administer the law must see to it
that they are not wholly evaded."

Again in the case of *Steele* v. *Townsend, supra,* at
page 257, the court quotes with approval from Justice
Gibson in 9 Watts (Pa.) 87, as follows: " 'Though
it is, perhaps, too late to say, that a carrier may not
accept his charge in special terms, it is not too late
to say, that the policy which dictated the rule of the
common law requires that exceptions to it be strictly
interpreted, and that it is his duty to bring his case
strictly within them.' "

While these expressions of regret, in most in-
stances, seem to have been uttered in connection with
innovations of the common-law doctrine applicable
to the transportation of property, rather than of per-
sons, there would be even greater reason for regret
if innovations on the common-law rule should be per-
mitted where life and limb are involved (*Graham &
Co.* v. *Davis & Co., supra,* 379, 380 and cases cited;
*Lake Shore, etc., R. Co.* v. *Teeters, supra; Ohio, etc.,
R. Co.* v. *Selby, supra*), and it is wholly immaterial
under what guise the innovation may appear, it is
equally to be condemned.   If the courts approve con-
tracts of this character, where, as in this case, they
are made by a common carrier for passenger carriage

alone, over its own line of road, in its own cars, operated solely by its own employes, on the theory that the contract is one for private carriage, rather than for common carriage, the innovation and the evils that will result are just as real, and in no way different from what they would be if they should hold that the contract is not in violation of public policy, as expressed and recognized in the cases cited herein.

We therefore believe that the courts should refuse to give their sanction to any innovation upon said general rule which will permit a common carrier to avoid responsibility for its own negligence resulting in injury to a passenger where, as in this case, it has the exclusive supervision and control of every element of such transportation from which such negligence is possible, and where, as in this case, its contract is for passenger carriage only, regardless of the guise under which such innovation is asked or presented, and hence hold that no error resulted from the court's rulings on the demurrers to said answers.

As before indicated, this, in effect, disposes of all the questions presented by this appeal, except an objection to instruction No. 9. It is insisted

8.     that under this instruction the jury was not directed to determine the damages from the evidence, but was permitted to give appellee such sum as it thought he was entitled to, regardless of the evidence.

While the instruction is open to criticism, its infirmities are not of a kind that were likely to be prejudicial or harmful, but were of that technical character contemplated by §700 Burns 1914, §658 R. S. 1881, for which a reversal is inhibited.

We might add that it appears from the record, by

implication at least, that appellant did not regard the verdict as excessive, as no such ground appears in his motion for new trial.

Finding no error in the record, the judgment below is affirmed.

Felt, C. J., Ibach, P. J., Caldwell, Batman and Dausman, JJ., concur.

NOTE.—Reported in 114 N. E. 1001.  Carriers: right of passenger carrier to stipulate against liability in consideration of reduced fare, 4 L. R. A. (N. S.) 1081; validity of stipulation in pass limiting liability, 37 L. R. A. (N. S.) 235.  See under (3) 10 C. J. 714; (5, 6) 10 C. J. 607, 714; (7) 10 C. J. 720.