INDIAN CREEK COAL AND MINING COMPANY v.
WEHR ET AL.

[No. 10,689. Filed April 30, 1920. Rehearing denied November
17, 1920.]

1. MASTER AND SERVANT.—*Workmen's Compensation.—Arising
Out of Employment.—Injury by Employer's Train.—Mines and
Minerals.*—Death resulting from an injury on the employer's
premises caused by a train furnished by the employer for the
use of the employes in going to and returning from a mine,
was an accident arising out of and in the course of the em-
ployment of a civil engineer employed in and around the mine.
p. 146.

2. MASTER AND SERVANT.—*Workmen's Compensation.—Employ-
ment.—Going To and Returning From.*—Whether an employe
in going to or returning from the place of his employment is
in the line of his employment is governed and controlled by
the particular circumstances and facts of each case. p. 151.

3. MASTER AND SERVANT.—*Workmen's Compensation.—Employ-
ment.—Liberal Construction.*—Courts have been liberal in so
interpreting workmen's compensation statutes as to bring in
many cases where the acts of the employes seemed to be out-
side of the strict and ordinary lines of duty, especially where
transportation was furnished by the employer as an incident
to the employment. p. 152.

From the Industrial Board of Indiana.

Proceedings under the Workmen's Compensation Act
by Lucile Wehr and others aganist the Indian Creek
Coal and Mining Company. From an award in favor
of claimants, the named company appeals. *Affirmed.*

*Charles E. Henderson* and *James L. Murray*, for ap-
pellant.

*Charles S. Batt* and *Walter S. Danner*, for appellees.

McMAHAN, J.—This is an appeal from an award
made by the Industrial Board in favor of appellee
Lucile Wehr on account of the death of her husband
Lloyd Wehr. Appellant's contention is that the injury
which resulted in the death of Lloyd Wehr did not arise

out of or in the course of his employment with appellant, but that it was the result of an accident which occurred after he had quit work for the day and while he was a passenger upon a railroad train.

Appellant owned and operated a coal mine located about thirteen miles from Vincennes, and employed about 400 men in and around this mine, all of whom lived in Vincennes. There were no houses at or near the mine where these men could live, and it was necessary that they be transported to and from their work by railroad. This mine was located between three and four miles away from the Indianapolis and Vincennes branch of the Vandalia Railroad. In 1911, when the mine was opened, appellant entered into an agreement with the railroad, under which a spur track was constructed from the railroad to the mine for the purpose of hauling the coal from the mine. In January, 1912, appellant and the railroad company entered into an agreement, whereby the railroad company agreed to run a train from Vincennes to the mine and back each work day for the purpose of carrying the miners and employes of appellant to and from their work. The appellant agreed to and did pay the railroad company $500 a month for the use of this train, and deducted $1.25 a month from the wages of each of its employes for the privilege of being carried on this train. The employes were required by appellant to, and they did, sign an agreement whereby they assumed all risk of personal injury or death while riding on said train, or in boarding or alighting therefrom, and released the appellant and all others connected with or concerned in the running of said train from all liability for damages on account of any personal injury sustained while getting on, alighting from, or riding on said train. A copy of said agreements between appellant and the railroad and between appellant and its employes is set out in

*Vandalia R. Co.* v. *Stevens* (1918), 67 Ind. App. 238, 114 N. E. 1001, and need not be copied here.

Lloyd Wehr was in the employment of the appellant and three other coal companies. On January 13, 1919, he was working for the appellant. He was a civil engineer and his duties consisted in surveying the mine and making maps thereof. In doing this work, he worked in and around the mine as well as in the office. The train which carried the miners to and from their work left Vincennes in the morning of each day and on the return left appellant's mine at 3 :45 p. m. On the afternoon of said day Mr. Wehr had been at work in the office. The regular quitting time for the men working at the mine was three o'clock. On this afternoon Mr. Wehr continued at his work in the office until just about time for the train to leave, when he ran out to catch the train which was just starting, and a few minutes later he was found on the railroad track between the rails with both legs broken and crushed. His body was found at a point about 200 feet from the office where he had been working, and about forty feet from the tipple. No one saw him at the time he was injured. He was not seen on the train, nor did any one see him get on the train. He was one of the last to leave the office. Mr. Donie, who was the superintendent of appellant, in his testimony said: "I did not see him get killed, but did see him about two minutes afterwards lying on the track of the main spur that brings the cars from the old I. V. to the mine. * * * The accident happened about 50, 75 or 100 feet from the end of the track at the mine. He was killed by the last or next to the last coach. He fell and was crushed. He had been doing general work around the mine that day. * * * He was the last to get on the train. When I came around he was lying on the ground and the gravel pile prevented us from seeing the accident. * * * He did

not have any duties for the mine on the train. His duties in relation to the Mining Company were all performed at the mine. He was not employed to go different places for the mine. When he left the mine his day's work was over, and he attempted to board the train to go to the place where he was boarding. He left the office just ahead of us, and he had quit his work when he left the office."

Another witness, who was on the train, said it had pulled out about 100 yards when he heard that a man had been run over. He went back and saw Mr. Wehr. He was about forty feet from the tipple, lying between the rails. He was conscious at that time, but did not say he had been run over by the train. His limbs were practically crushed off. He was on the track where the train had just passed. The witness did not see him get on the train and did not know whether any one saw him fall under the train.

The evidence does not disclose who is the owner of the right of way over which the spur runs from the main line to the mine. It is certain, however, that at the point where Mr. Wehr was injured the track was located upon the property of the appellant. Mr. Donie testified that he did not know who owned that track.

Prior to the decision in the Stevens case, in January, 1917, the train which carried the workmen to and from appellant's mine was operated under the written contract hereinbefore mentioned. Appellant's president and superintendent both testified that, after the decision in the Stevens case, the train was not operated under the original written contract, although no other contract was ever entered into between appellant and the railroad company. Appellant continued to and at the time of Mr. Wehr's death was paying the railroad company $500 a month to operate this train. During part of the time the appellant deducted $1.50 a month from the

wages of each of its employes for the privilege of riding on the train. This was afterwards changed to $1.25 a month. If the workmen had been required to pay the regular fare, which amounted to forty-four cents each way, it would have amounted to $22 a month, and appellant could not have secured men to operate its mine. It was cheaper for the appellant to guarantee the $500 per month than to provide homes for the men at the mine.

While the president of appellant testified that the agreement with the railroad was abrogated after the decision in the Stevens case, he also testified that no other or different agreement was thereafter entered into. The train was operated the same way and on the same terms, after the decision in the Stevens case, as it was before that decision. It is evident that this train was being run for the benefit of appellant; that appellant had agreed to pay, and at the time of the injury to Mr. Wehr was paying, the railroad company $500 a month for the train, and, in order to recoup itself in whole, or in part at least, deducted from $1 to $1.50 a month from the wages of its employes, and issued tickets to them, which entitled them to ride on this train. These tickets were furnished by the railroad, but were not punched or taken up by the conductor on the train. In addition to the facts hereinbefore stated, the evidence clearly shows that the train which Mr. Wehr was intending to get on was furnished by appellant for the sole purpose of getting its workmen to and from their place of work, and that it was the only way of getting them to their work or getting them to their homes after their day's work was done. It was necessary for appellant to have this train in order to get its men to the mine, and it was furnished by appellant for that purpose.

At the time Mr. Wehr was injured, he was leaving his work, but was yet on the premises of appellant. Whether in running to catch the train he stumbled over the pile of gravel, or whether he was attempting to get on the train and slipped and fell, is not disclosed by the evidence. But it is shown by the evidence that he was on the way from the office to the train which was furnished by appellant to carry him and appellant's other workmen to their homes, and that in attempting to take the train he was injured to the extent that he died a few hours later. He was on the premises of appellant, where he not only had a right to be, but where it was necessary for him to be in order to get on the train which appellant had furnished and which it expected and intended he should take in order to get to and from his work. In attempting to reach this train, he was injured. How or why he was injured is not shown, but it was caused by one of the instrumentalities furnished by appellant and was one of the accidents reasonably and fairly growing out of appellant's business and in the course of the employment of Mr. Wehr.

It is frequently difficult to determine whether an injury is suffered by an accident arising out of the employment by applying the standard of some other case. Each case must be considered with reference to the particular facts in the case. In the case at bar, we are impressed that the accident arose from a hazard occasioned by the conduct of appellant in the operation of its mine.

In *Re Stacy* (1916), 225 Mass. 174, 114 N. E. 206, an icehouse laborer on his way home from work was drowned by breaking through the ice while crossing a pond in the control of his employer, crossing the pond on the ice being the reasonable and customary way for

him to reach his home, and the way the other employes living in that direction regularly took in reaching their homes. In affirming an award, the court in that case said: "While the employe's work for the day had been finished and he was on his way home at the time of the fatal accident, still it is settled that an injury to a workman may arise out of and in the course of his employment, even if he is not actually working at the time of the injury. * * * The finding that the pond was in control of the employer and that crossing over it upon the ice was the 'reasonable and customary way' for the deceased to reach his home, and that he and other employes who lived in the same direction 'crossed it this way regularly,' warranted the further finding that the injury occurred in the course of the employment. It also could have been found that the death of the employe was due to his employment as a contributing proximate cause, incidental to the nature of the work in which he was engaged. There was evidence from which the board could have found that Stacy's death occurred by reason of the special hazard incident to the work, which it was his duty to perform."

The same court, *In re O'Toole* (1918), 229 Mass. 165, 118 N. E. 303, said: "If the employe is injured in going to or returning from his work upon the master's premises, or on premises available for the purpose, or if during intervals of leisure which occur in the course of his employment he is injured, he may still be within the scope of his employment and entitled to the benefits of the act."

We think it is clear from the evidence in this case that the injury and death of Mr. Wehr occurred by reason of the special hazards incident to the work which it was his duty to perform, and that the finding of the Industrial Board that the same arose out of and in the

course of his employment is sustained by the evidence, and is not contrary to law. The award is affirmed and increased five per cent.

ON PETITION FOR REHEARING.

McMAHAN, C. J.—Our statements in the principal opinion, wherein we said that appellant employed about 400 men in and around its mine, all of whom lived in Vincennes, and that Mr. Wehr continued his work in the office until it was about time for the train to start, are not strictly correct. We should have said that appellant employed in and around its mine about 400 men who lived in Vincennes, and that, according to the statement of the appellant in its brief, these were practically all of the men who were employed by appellant at this mine. While there may be no positive evidence that Mr. Wehr continued at his work, it is clear that he and his assistant remained in the office until the train was ready to leave, when they ran out to catch it. Some of his work was performed in the office. There is no direct evidence as to when he quit, other than the statement of appellant's superintendent that his quitting time was three o'clock, and that he had quit work when he left the office. To be more nearly accurate, we should have said that when he was injured he was leaving the office where he had been at work, but was yet on the premises of the appellant.

The appellant, however, contends that at the time of his injury he was not on the premises of appellant, but was on the right of way of the railroad company. There is no evidence that the railroad company owned a right of way. The legitimate inference to be drawn from the evidence is that the spur track, where Mr. Wehr was killed, was laid on the premises of the appellant.

The evidence is that the mine is about three miles south and east of the main line of the Indianapolis and

Vincennes Railroad; that, when the mine was opened, a spur track was laid from the main line to appellant's mine for the purpose of getting coal from the mine; that the spur track was used as a siding for cars and for the miner's train which ran from Vincennes to a point ten or twelve feet from the mine, and that appellant's property extended about 1,000 feet north of the mine.

The evidence is not positive as to who owned this spur track. The president of the appellant testified that it was built and owned by the railroad company. Mr. Donie, the superintendent, said he did not know who owned it. Prior to the war the railroad kept it in repair, but when the government took possession of the railroads, the war department issued instructions that appellant should make the repairs to this track, if it wanted the track maintained. Following this instruction, the superintendent says appellant made the repairs, while the appellant's president says it refused to make them.

In 1912 the appellant entered into an agreement with the railroad company for the operation of the miner's train, as stated in the principal opinion. The train was operated under that agreement until after the decision in the Stevens case. After that decision there was one or two meetings between officials of appellant and the railroad company relative to the operation of the train, and, while appellant's superintendent testified that this contract had been abrogated, no new contract was ever made between the appellant and the railroad. The railroad company continued to run the train the same as it had been doing before the decision in the Stevens case, and appellant continued to pay $500 a month for the use of this train, and to deduct a sufficient amount from the pay of the miners riding on it to recoup itself for the money it paid to the railroad company, the same as

it had theretofore been doing. The evidence conclusively shows, without any contradiction, that there was no change as to the method of paying for the train, or in the amount of money which appellant, through its system of bookkeeping, retained out of what it was pleased to term the monthly wage of its employes. The fact remains that it was necessary for appellant to have the train, and that it paid the railroad company $500 a month for its use.

The amount retained out of the so-called monthly wage of each man was not the same each month. Some months $1.50 was deducted, although $1.25 seems to have been the amount usually deducted, as that was generally sufficient to raise the $500. Indeed, it appears that at the end of one month the appellant, after paying the railroad company the $500, had some money on hand, which it had collected from the employes and which it did not then pay to the railroad, and the next month it deducted only $1 from the pay of each man, as that was sufficient, with the money on hand, to make up the $500. It is certainly a fair inference from the evidence that the railroad, through some kind of an agreement with appellant, expected to and did receive from appellant $500 a month for the use of this train, and that the railroad was not interested in and did not pretend to fix the amount that should be levied upon the miners by appellant in recoupment.

Practically all the men employed by appellant in this mine live in Vincennes. The evidence does not disclose whether there were any houses near the mine where any of these men could live, but, as testified to by appellant's superintendent, the men lived in the city and it was necessary to get them out to the mine; that appellant would have difficulty in getting men if it did not provide a way for them to get to the mine; that it was customary, where mines were so located, that they

arrange for a train; that it was necessary for appellant to have a train to get the men. If the miners had to pay the regular fare, appellant could not get them out to the mine, and if they did not run the train, the men could not get to the mine, and the mine could not operate.

One of the most difficult problems met with in the enforcement of the Workmen's Compensation Act is the determination of the question whether an injury

2. arose out of and in the course of the employment.

The employment is not limited to the exact moment when the workman reaches the place where he is to begin his work, or to the moment when he ceases that work. It necessarily includes a reasonable amount of time and space before and after ceasing actual employment, having in mind all the circumstances connected with the accident. Whether an employe in going to or returning from the place of his employment is in the line of his employment is governed and controlled by the particular circumstances and facts of each case. There must, however, be a line beyond which the liability of the employer cannot continue. Where that line is to be drawn is usually a question of fact. *Wabash R. Co.* v. *Industrial Comm.* (1920), 294 Ill. 119, 128 N. E. 290. To the same effect is *Smith* v. *South, etc., Colliery Co.* (1902), 88 L. T. 5, 5 W. C. C. 14, where the court said: "It is a question of fact up to what point of time the employment can be said to continue after the workman has ceased working. While the workman is leaving the place where he is employed, I think that, for the purposes of this act, his employment would still continue. But though his employment may continue for an interval after he has actually ceased working, yet there must come a time when he can no longer be said to be engaged in his employment in such a way that an accident happening to him can be said to have arisen

out of and in the course of his employment. There must be a line beyond which the liability of the employer cannot continue, and the question where that line is to be drawn in each case is a question of fact." The usual rule appears to be that a man's employment does not begin until he reaches the place of his work or the scene of his duty, and does not continue after he has left the premises of his employer. Bradbury, Workmen's Compensation (3d ed.) 468.

Courts have been liberal in so interpreting workmen's compensation statutes as to bring many cases within the statute where the acts of the employes seemed to be outside of the strict and ordinary lines of duty; as where an employe was injured while eating his dinner upon the premises in accordance with the permission of the employer or general custom (*Mann* v. *Glastonbury Knitting Co.* [1916], 90 Conn. 116, 90 Atl. 368, L. R. A. 1916D 86) ; to a workman on a telegraph line who, during a storm, had taken refuge under a freight car and had gone to sleep (*Moore* v. *Lehigh Valley R. Co.* [1916], 217 N. Y. 627, 111 N. E. 1092) ; to an employe who was injured while returning from a cabin on the premises of a railroad company to which the employes were permitted to go to eat their meals (*Earnshaw* v. *Lancaster, etc., R. Co.* [1903], 5 W. C. C. 28) ; to a lighterman who, while waiting for the tide to ebb, went from his barge to a small boat a short distance therefrom to rest (*May* v. *Ison* [1914], 7 B. W. C. C. 148) ; to an employe who was injured by a falling wall while he was eating his dinner on the employer's premises (*Blovelt* v. *Sawyer* [1903], 6 W. C. C. 16) ; to an employe who, in accordance with the general custom, left the composing room where he worked to go upon the roof and get fresh air on a hot night (*Von Ette's Case* [1916], 223 Mass. 56, 111 N. E. 696, L. R. A. 1916D 641) ; to an employe engaged in dumping

cars, who on a cold night during an interval of leisure, for the purpose of warning himself, sat or lay down in a position where he was injured by a moving car (*Northwestern Iron Co.* v. *Industrial Comm.* [1915], 160 Wis. 633, 152 N. W. 416) ; to an employe who was injured while getting down from a moving wagon, where he rightfully belonged, to pick up his pipe (*McLauchlan* v. *Anderson* [1911], 4 B. W. C. C. 376) ; to an employe who was injured while attempting to stop a runaway horse of his employers and where his regular work was entirely unconnected with horses (*Rees* v. *Thomas* [1899], 1 W. C. C. 9) ; to an employe who, in the line of his duty, reproved a fellow workman, and was struck by the latter in the eye (*Matter of Heitz* v. *Ruppert* [1916], 218 N. Y. 148, 112 N. E. 750, L. R. A. 1917A 344) ; to an employe who left the strict line of his employment and attempted to rescue another workman, technically in the employ of an independent contractor, from a danger which threatened his life (*Matter of Waters* v. *Taylor Co.* [1916], 218 N. Y. 248, 112 N. E. 727, L. R. A. 1917A 347) ; to a workman falling from a boat, which was his only method of getting to and from his work, and which was supplied by employer (*Mole* v. *Wadworth* [1913], 6 B. W. C. C. 129) ; to a miner who, while waiting to get a train provided by the employer to convey miners to and from their mine, was pushed off the platform and killed (*Cremins* v. *Guest* [1907], 1 B. W. C. C. 160; *Walton* v. *Tredegar, etc., Coal Co.* [1913], 6 B. W. C. C. 592) ; to an employe whose contract of employment required the employer to pay the expense of the employe's transportation to and from his home, and who was killed while riding from his place of work to a railroad station in an automobile furnished by the employer (*Swanson* v. *Latham* [1917], 92 Conn. 87, 101 Atl. 492) ; to an employe injured while being driven to place of work in an automobile furnished

by employer pursuant to employment contract (*Sala* v. *American, etc., Tobacco Co.* [1918], 93 Conn. 82, 105 Atl. 346) ; to a laborer on the way home from work, who was drowned by breaking through the ice while crossing a pond in control of the employer (*In re Stacy, supra*) ; to an employe injured while boarding a train owned and operated by a railroad company, where the employer had agreed to and did furnish free transportation to and from the place of work (*Harrison* v. *Central Construction Co.* [1919], 135 Md. 170, 108 Atl. 874) ; to an employe where the employer, on demand of employes for free transportation from railroad station to a place in country where they were building a house, hired a truck to carry employes to and from work, and employe was injured while in such truck on way to station (*Matter of Littler* v. *Fuller Co.* [1918], 223 N. Y. 369, 119 N. E. 554) ; to a miner who, after leaving his lamp, started home and while crossing a frosty and slippery railroad track forming part of coal siding, slipped and fell (*Wales* v. *Lambton, etc., Co.* [1917], 117 L. T. 454, 33 L. T. R. 504, 10 B. W. C. C. 527).

In *Dominguez* v. *Pendoia* (1920), (Cal. App.) 188 Pac. 1025, where the employe was killed by being thrown from an automobile furnished by the employer to transport the employes to the place of work, the court, in holding that injury and death arose out of and in the course of the employment, said: "Where transportation is furnished by an employer, as an incident of the employment, to convey an employe to and from the place of employment, an injury suffered by the employe going or coming in the vehicle so furnished by the employer, and under the control of the employer, arises out of and is in the course of the employment within the meaning of the compensation act." Citing *In re Donovan* (1914), 217 Mass. 76, 104 N. E. 431, Ann. Cas. 1915C

778; *Matter of Littler* v. *Fuller Co., supra; Judson Mfg. Co.* v. *Industrial Acc. Com.* (1919), 181 Cal. 300, 184 Pac. 1; *Starr Piano Co.* v. *Industrial Acc. Com.* (1919), 181 Cal. 433, 184 Pac. 860; Bradbury, Workmen's Compensation (3d ed.) 480-484.

We are well within the authorities in holding that the evidence is sufficient to support the finding of the Industrial Board that the death of Mr. Wehr arose out of and in the course of his employment.    *Kilduff* v. *Boston, etc., R. Co.* (1907), 195 Mass. 307, 81 N. E. 191; *Feneff* v. *Boston, etc., R. Co.* (1907), 196 Mass. 575, 82 N. E. 705; *Kowalek* v. *New York, etc., R. Co.* (1919), 190 App. Div. 160, 179 N. Y. Supp. 637; *Donlon* v. *Kips Bay, etc., Co.* (1919), 189 App. Div. 415, 179 N. Y. Supp. 93; *Keaney's Case* (1919), 232 Mass. 532, 112 N. E. 739; *In re Stacy, supra; Moran's Case* (1920), 234 Mass. 566, 125 N. E. 591; *In re Sanderson's Case* (1916), 224 Mass. 558, 113 N. E. 355; *Chicago, etc., R. Co.* v. *Industrial Com.* (1919), 288 Ill. 126, 125 N. E. 278; *Manchester St. Railway* v. *Barrett* (1920), 265 Fed. 557; *Gane* v. *Norton Hill, etc., Co.* (1909), 2 B. W. C. C. 42, 100 L. T. 979; *Hoskins* v. *Lancaster* (1910), 26 T. L. R. 612, 3 B. W. C. C. 476; *Smith* v. *South, etc., Colliery Co., supra; Sharp* v. *Johnson & Co.* (1905), 7 W. C. C. 28; *Marsh* v. *Pope* (1917), 117 L. T. 456, 33 T. L. R. 523, 10 B. W. C. C. 566; *Wales* v. *Lambton, etc., Co., supra; Whittall* v. *Staveley Coal, etc., Co.* (1917), 117 L. T. 130, 10 B. W. C. C. 298; *Stewart* v. *Longhurst* (1917), 116 L. T. 763, 33 T. L. R. 285, 10 B. W. C. C. 266; *Great Lakes Dredge, etc., Co.* v. *Totzke* (1919), 69 Ind. App. 303, 121 N. E. 675; *In re Loper* (1917), 64 Ind. App. 571, 116 N. E. 324; *Holland, etc., Sugar Co.* v. *Shraluka* (1917), 64 Ind. App. 545, 116 N. E. 330, and authorities herein before cited.

Petition for rehearing denied.