JOEL HARRISON, Claimant,

*vs.*

THE CENTRAL CONSTRUCTION CO., Employer, and
THE MARYLAND CASUALTY CO., Insurer.

*Workmen's Compensation Act—When Employment Com-
mences—Transportation to Place of Work.*

A claimant under the Workmen's Compensation Act must
show, firstly, that he was engaged in an extra-hazardous em-
ployment, and, secondly, that the injury arose out of and in the
course of the employment.                                    p. 176

Though an injury to an employee while on his way to work
is not received in the course of his employment, if a workman is
employed to work at a certain place, and as a part of his con-
tract of employment there is an agreement that his employer
shall furnish him free transportation to or from his work, the
period of service continues during the time of transportation,
and an injury which occurs during the course of transportation
is regarded as arising out of and in the course of the employ-
ment.                                                     pp. 176-179

The question as to whether an injury arose out of or in the
course of the employment is ordinarily, like negligence or want
of probable cause, a mixed question of law and fact; but when
the facts have been ascertained and agreed upon by the parties,
or are undisputed, and there is no dispute as to the inferences
to be drawn from the facts, the question becomes one of law
and may be decided by the court.                            p. 180

*Decided November 21st, 1919.*

Appeal from the Baltimore City Court (Bond, J.).

The stipulation referred to in the opinion was as follows:
    "It is hereby agreed and stipulated by and between
the parties to the above entitled cause through their
respective attorneys, that the following facts are perti-
nent to the issues in said cause, are susceptible of legal
proof, and shall be taken as true for the purposes of this
cause, and for the purpose of any appeal in this case:

"1.  That Joel Harrison, employee and claimant, was employed by the Central Construction Corporation at and prior to July 19, 1918, for work upon the Edgewood Arsenal, at Magnolia.

"2.  That the Central Construction Company was engaged solely within the State of Maryland upon work under a percentage contract for the United States Government in the development and construction of Edgewood Arsenal, at Magnolia, aforesaid.

"3.  That Joel Harrison lived in the City of Baltimore, and traveled to and from his work at Edgewood Arsenal, aforesaid, upon the lines of the Pennsylvania Railroad Company running from Union Station, Baltimore, to Magnolia Station, at Magnolia.

"4.  That Harrison, in going to and from work, aforesaid, rode upon what is known as a 'Special Work Train,' operated by the Pennsylvania Railroad Company over its lines, as aforesaid.

"5.  That there are several (at least two) of these special work trains leaving Union Station each morning for Magnolia, Aberdeen and other points adjacent to said Edgewood Arsenal and returning therefrom in the evening.

"6.  That prior to the date upon which the running of the special work trains, aforesaid, was inaugurated the Pennsylvania Railroad Company had regular trains on regular schedule, which carried the workmen, resident in Baltimore, of the several contractors at Edgewood Arsenal, to and from Magnolia, and that the so called special trains were put on simply because the increasing number of workmen made it difficult, if not impossible, to handle the situation on the regular local trains.

"7.  That all of the workmen and employees, residing in Baltimore, of the several contractors engaged upon government work at Edgewood Arsenal, customarily ride upon these trains.

"8.  That clerks and office employees resident in Baltimore as well as mechanics and laborers are furnished free transportation over the said Pennsylvania

Railroad lines and upon said special work trains, upon displaying either an identification button or an identification button and an identification card.

"9. That the employees who are given free transportation upon said special work trains are not paid by the Central Construction Corporation for the time engaged in making the run from Union Station to Magnolia, but that said trains are so scheduled as to reach Magnolia in ordinary course, prior to the hour set for the beginning of the day's work, and that the pay of the employees on any special work train so scheduled to reach Magnolia before the beginning of the day's work are ordinarily paid from the hour set for the beginning of the day's work, even when the train is late and reaches Magnolia after such hour.

"10. That all employees engaged upon the Edgewood Arsenal, whether employees of the Central Construction Corporation or other contractors there engaged, receive eleven hours' pay for ten hours' work, and that this rate of pay is not dependent upon the traveling of the employees to and from Baltimore, but applies to all employees, whether resident upon the Arsenal itself, resident in adjacent villages, or resident in Baltimore.

"11. That all legitimate expense incurred by the Central Construction Corporation in its work for the Government at Edgewood Arsenal, aforesaid, is ultimately borne by the United States Government under the terms of the percentage contract hereinabove referred to.

"12. That prior to July 10, 1918, the Central Construction Corporation arranged for the payment of the transportation expense of certain of its employees as above referred to over the said Pennsylvania Railroad Company's lines.

"13. That after July 10, 1918, the United States Government, by virtue of an arrangement made through its War Department and by its direct representatives with the Pennsylvania Railroad Company, paid the Pennsylvania Railroad Company direct, with-

out the intervention of the Central Construction Corporation, an agreed sum for the transportation of employees of the Central Construction Corporation and employees of other contractors engaged upon work at Edgewood Arsenal, as aforesaid, and transported over the lines of the Pennsylvania Railroad Company in the special work trains above mentioned.

"14.   That on and after July 10, 1918, the Central Construction Corporation did not check up, nor take account of in any way its employees traveling to and from their work on the special trains, aforesaid, but that such checking and accounting of the Central Construction Corporation's employees and employees of other contractors at Edgewood Arsenal was done by and under the sole direction of the United States Government through its officers and soldiers in uniform or otherwise.

"15.   That during the period of his employment by the Central Construction Corporation, Harrison was of the class of employees that received free transportation upon the lines of the Pennsylvania Railroad Company hereinabove described.

"16.   That on July 19, 1918, Joel Harrison, the employee and claimant in this cause, proceeded to Union Station and there was directed to board what he understood to be a work train of the Pennsylvania Railroad Company bound for Magnolia; and that after boarding said train and after the same had left Union Station he was told by a railroad official of said train, the Pennsylvania ticket collector, that the train did not stop at Magnolia, but stopped only at Aberdeen, and that he (Harrison) should leave the train where it made a stop just before reaching Back River Station, and take the following work train.

"17.   That accordingly Joel Harrison left said train at the point in the preceding paragraph indicated and walked a distance of several hundred feet into Back River Station, and was there told by the Pennsylvania Railroad Company's policeman that the following train would not stop at Back River Station,

but would stop at the same point where the train which Harrison had just·left had· stopped, to wit, several hundred ·feet from the station; that thereupon Harrison went back· to the ·point that he had just left the first train, and was proceeding· to·board the following train, which in the meantime had pulled in and stopped, when the train suddenly started and ·threw him under the wheels, causing an injury which directly resulted in the loss of his right foot at a point midway between the knee and ·ankle.

"18. · That Harrison, employee and claimant, as aforesaid, was not aware of the precise nature of the arrangement with the Pennsylvania Railroad Company by which he received free transportation over its lines, as aforesaid, but that Harrison had been told when he entered the employ of the Central Construction Corporation that he would be furnished with free transportation; that some time prior to his accident it was announced that the Central Construction Corporation would no longer be responsible for free transportation; that thereafter the workmen were told that the free transportation would be continued, but that, as aforesaid, Harrison did not know at ·whose instance the free transportation was so continued; whether at the instance of the Central ·Construction Corporation, or at the direct instance of the United States Government, acting through its War Department; that Harrison knew, however, that workmen and employees generally of the Central Construction Corporation and other contractors · at Elgewood Arsenal ·were not required by their employees ·to travel to and fro upon said trains, but were at liberty to use any other mode of conveyance that they preferred; or ·to live upon the reservation in bunk houses provided by the employers, or to live in adjacent villages.

"19. That Harrison was employed by the Central Construction Corporation through its offices in Baltimore City.

· "(After the signatures of the attorneys the following stipulations ·were added by agreement to the above

series of stipulations prior to argument in the above
case) :

"Add to Stipulation 14. That checking was done by
the Central Construction Corporation at irregular in-
tervals at request of Government authorities, for the
purpose of verifying the right of employees to the but-
tons and cards presented by them.

"20. The aforegoing stipulations are in addition
to and are to be considered with the testimony taken
before the State Industrial Accident Commission in the
above case."

The cause was argued before BOYD, C. J., BURKE, THOMAS,
URNER and ADKINS, JJ.

*Clifton S. Brown,* with whom was *Milton Roberts* on the
brief, for the appellant.

*Austin J. Lilly* and *Walter L. Clark,* for the appellees.

BURKE, J., delivered the opinion of the Court.

Joel Harrison, the appellant, was an employee of the Cen-
tral Construction Company, a corporation which was doing
certain construction work for the United States Government
at Edgewood Arsenal, Magnolia, Maryland. He was seri-
ously injured on the 19th of June, 1918, and thereafter filed
a claim for compensation with the State Industrial Accident
Commission against the Central Construction Company, Em-
ployer, and The Maryland Casualty Company, Insurer, and
was awarded compensation by that body. An appeal was
taken by the employer and insurer. The appeal was heard in
the Baltimore City Court, without a jury, upon a transcript
of the record from the Commission, in addition to certain
facts set forth in a stipulation between the parties filed in the
case and which appears in the record. The *Reporter* will set
out this stipulation in the report of the case. At the conclu-
sion of the case the Court ruled, as a matter of law, that the
injury described in the stipulated facts and in the papers in

the case, under the circumstances there described, was not one
which arose out of and in the course of his employment within
the meaning of the Maryland Workmen's Compensation Act,
and in accordance with this holding the decree of the State
Industrial Accident Commission was reversed. From the
judgment reversing the award of the Commission the appeal
before us was taken.

The Act (Code, Art. 101, Sec. 32) provides compensation
for injuries sustained or death incurred by employees en-
gaged in certain extra-hazardous employments specified, and,
in addition to the classes enumerated, it applies to all other
extra-hazardous employments. Compensable injuries under
the Act are defined to "mean only accidental injuries arising
out of and in the course of employment and such disease or
infection as may naturally and unavoidably result there-
from." Code, Art. 101, Sec. 63. Therefore, it is clear that
before a claimant is entitled to compensation he must show,
*first,* that he was engaged in an extra-hazardous employment,
and, *secondly,* that the injury arose out of and in the course
of the employment. Both conditions must be shown. In this
case it is not disputed that the appellant was engaged in an
extra-hazardous employment. The sole question in the case
is: Did his injuries arise out of and in the course of that
employment? The stipulation to which we have referred
discloses the facts and circumstances of the employment as
well as the circumstances under which the injuries were
received, and, in the view we take of the case, it will be suffi-
cient to refer to what we regard as the controlling and deter-
mining facts appearing in the stipulation.

The appellant lived in Baltimore City. It was a part of
his contract with the Central Construction Company that it
would furnish him free transportation to his work at Mag-
nolia. He and other workmen of the Construction Company
used certain work trains over the Pennsylvania Railroad
from Union Station, Baltimore, to and from their work. The
Construction Company furnished him a button for identifica-
tion, and this button was evidence to the conductor of his

right to free transportation. The superintendent of the company said to the workmen, as expressed in the evidence before the Commission, you have "free transportation on your button."

It appears from the stipulated facts that, "On July 19, 1918, Joel Harrison, the employee and claimant in this cause, proceeded to Union Station and there was directed to board what he understood to be a work train of the Pennsylvania Railroad Company bound for Magnolia; and that after boarding said train and after same had left Union Station he was told by a railroad official of said train, the Pennsylvania ticket collector, that the train did not stop at Magnolia, but stopped only at Aberdeen, and that he (Harrison) should leave the train where it made a stop just before reaching Back River Station, and take the following work train.

"That accordingly Joel Harrison left said train at the point in the preceding paragraph indicated and walked a distance of several hundred feet into Back River Station, and was there told by the Pennsylvania Railroad Company's policeman that the following train would not stop at Back River Station, but would stop at the same point where the train which Harrison had just left had stopped, to wit, several hundred feet from the station; that thereupon Harrison went back to the point that he had just left the first train, and was proceeding to board the following train, which in the meantime had pulled in and stopped, when the train suddenly started and threw him under the wheels, causing an injury which directly resulted in the loss of his right foot at a point midway between the knee and ankle."

When the injury occurs before the beginning or after the termination of work there are two general rules applicable to the question as to whether it arose out of and in the course of the employment. The first is that an employee, while on his way to work, is not in the course of his employment. The second is that where the workman is employed to work at a certain place, and as a part of his contract of employment there is an agreement that his employer shall furnish him

free transportation to or from his work the period of service continues during the time of transportation, and if an injury occurs during the course of transportation it is held to have arisen out of and in the course of employment. The cases relied on by the appellees announce and apply the first rule. The second rule has the support of English and American cases.

In the case of *In Re Donovan,* 217 Mass. 76, 104 N. E. Rep. 431, the question involved was whether Donovan's injury arose out of and in the course of his employment within the meaning of the Workmen's Compensation Act of Massachusetts. The facts were that "Donovan was employed by McGreevey in cleaning out catch-basins at a place about two miles from his home. It had been and was his custom, in common with other employees and with the knowledge and consent of his employer, to ride to and from the vicinity of the catch-basins in a wagon furnished by his employer, the wagon meeting the employees on the street and the employer being notified if any of the employees failed to report for work at the beginning of the day. The wagon was at the service of the employees at the end of the day, and they might ride in it back to the employer's barn if they wished. Donovan was injured while so riding in this wagon at the end of his day's work, and the board has found that his transportation on the wagon was 'incidental to his employment,' and 'therefore' arose 'out of and in the course of said employment.' The language of this last finding is a little obscure; but we treat it, as both counsel and also the Superior Court have treated it, as being an inference that Donovan's injury arose out of and in the course of his employment, drawn from the other facts stated, including the fact that the transportation was 'incidental to his employment.' The question to be decided is, therefore, whether this inference could be drawn from those facts; for the facts themselves now cannot be inquired into. St. Mass., 1912, C. 571, S. 14.

"There have been several decisions in England as to when and how far an employee can be said to have been in the

employ of his master, while traveling to and from his work in a vehicle or means of conveyance provided by the latter, and how far injuries received in such a conveyance can be said to have arisen out of and in the course of the employment. Many of these decisions have been cited and discussed by *Professor Bohlen, in* 25 *Harvard Law Review,* 401, *et seq.* From his discussion and the cases referred to by him, and from the later decisions of the English courts, the rule has been established, as we consider, in accordance with sound reason, that the employer's liability in such cases depends upon whether the conveyance has been provided by him, after the real beginning of the employment, in compliance with one of the implied or express terms of the contract of employment, for the mere use of the employees, and is one which the employees are required, or as a matter of right are permitted, to use by virtue of that contract. See *Davies* v. *Rhymney Iron Co.,* 16 Times Law Rep. 329; *Holmes v. Great Northern Rwy.* (1900), 2 Q. B. 409; *Whitbread* v. *Arnold,* 99 L. T. 105; *Cremins* v. *Gest, Keen & Nettlefolds* (1908), 1 K. B. 469; *Gane* v. *Norton Hill Colliery Co.* (1909), 2 K. B. 539; *Hoskins* v. *J. Lancaster,* 3 Butterworth, Workmen's Compensation Cases, 476; *Parker* v. *Pout,* 105 L. T. 493; *Walters* v. *Staveley Coal & Iron Co.,* 105 L. T. 119, and 4 Butterworth, Workmen's Compensation Cases, 89 and 303; *Greene* v. *Shaw* (1912), 2 Ir. 430, and 5 Butterworth, Workmen's Compensation Cases, 530; *Mole* v. *Wadworth,* 6 Butterworth, Workmen's Compensation Cases, 128; *Edwards* v. *Wingham Agricultural Implements Co.* (1913), 3 K. B. 596, and 6 Butterworth, Workmen's Compensation Cases, 511; *Walton* v. *Tredegar Iron & Coal Co.,* 6 Butterworth, Workmen's Compensation Cases, 592." See also 12 *Negligence and Compensation Cases,* 370, 373.

It was earnestly contended that the English cases ought not to be followed in the construction of the Maryland Act because the Compensation Law of Great Britain covers all classes of employments, while the Maryland Act is limited to such as are extra-hazardous. But under both Acts the injury

must be shown to have arisen out of and in the course of the employment, and the mere fact that the class of injuries for which compensation is allowed under the Maryland Act is limited can make no difference so far as the question here presented is concerned.

The appellant's counsel contended that the Court had no power to grant the prayer referred to in the early part of this opinion, which declared as a matter of law that the injury did not arise out of and in the course of Harrison's employment, because that was in all cases a question of fact to be found either by the jury or by the Court sitting as a jury. In support of this contention he relied upon the cases of *Jewel Tea Co.* v. *Weber,* 132 Md. 178; *Coastwise Shipbuilding Co.* v. *Tolson,* 132 Md. 203, and *Beasman* v. *Butler,* 133 Md. 382. Under the facts and circumstances of those cases, the Court was merely announcing the general rule that all facts and inferences from facts adduced in support of the claimant's case must be submitted to the jury. The question as to whether an injury arose out of or in the course of the employment is ordinarily, like negligence or want of probable cause, a mixed question of law and fact; but when the facts have been ascertained and agreed upon by the parties, or are undisputed and there is no dispute as to the inferences to be drawn from the facts, the question becomes one of law and may be decided by the Court.

It follows from the views expressed that the Court committed an error in granting the prayer referred to and in reversing the award of the State Industrial Accident Commission.

*Judgment reversed, with costs, and new trial awarded.*