CHARLES A. SCHEMMEL *v.* T. B. GATCH & SONS
CONTRACTING AND BUILDING COMPANY.

[No. 10, April Term, 1933.]

*Decided April 21st, 1933.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Philander B. Briscoe,* with whom were *Briscoe & Jones* on the brief, for the appellant.

*George E. Kieffner* and *Thomas M. Jacobs,* with whom were *Stewart, Pearre & Kieffner* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Charles A. Schemmel, on July 1st, 1931, while engaged in the performance of his duties as a foreman for T. B. Gatch & Sons in the operation of their "Bush" quarry near Churchville in Harford County, Maryland, suffered a cerebral hem-

orrhage which caused a disability which, while uncertain in its ultimate duration and extent, was at least temporarily total.

On August 22nd, 1931, he filed with the State Industrial Accident Commission a claim for compensation on the ground that his injury was accidental and arose out of and in the course of his employment. The claim was contested, and, after a hearing and evidence, the commission found that the claimant did not suffer an accidental injury arising out of and in the course of his employment, and disallowed the claim. From that order the claimant appealed to the Circuit Court for Baltimore County, where, after a trial, a directed verdict was entered in favor of the employer, and the New Amsterdam Casualty Company, the insurer, and against the claimant. This appeal is from the judgment on that verdict.

The single question which it submits for review is whether the evidence in the case was legally sufficient to permit a rational inference that the injury of which he complains was accidental in its nature, and whether it arose out of and in the course of the employment in which Schemmel was engaged at the time it occurred.

The consideration of that question is affected by two rules —one statutory, that the decision of the commission is *prima facie* correct, and the burden of proof is upon the party attacking the same (Code, art. 101, sec. 56); and the other dialectical, that one who denies that given facts will support a particular inference for that question concedes that the facts exist and that they are true.

The meaning and the effect of the statutory rule is, since the adoption of chapter 406 of the Acts of 1931, not entirely free from doubt. Under the act, as construed in *Thomas v. Pennsylvania R. Co.*, 162 Md. 509, 160 A. 793, appeals from decisions of the commission shall be tried in the courts to which such appeals are taken upon the record made before the commission. Under the law as it stood before that act the rule was that the burden of proof was upon the party attacking the decision to show that the commission had erred,

and that is the rule now. But there is this difference: under the law before the act of 1931, an appellant from the commission's decision could meet that burden either by showing that the commission had misconstrued the law or the facts proved before it, or by adducing new evidence in the court to which the appeal was taken to show that, upon all provable and proved facts in the case, not necessarily that the commission erred, but that its decision was wrong, for the case before the commission might, because of the new evidence, be different from that presented on appeal. Under the law as it stood then, the trial on appeal was virtually a trial *de novo,* except that the appellant carried the burden of showing affirmatively that the commission had erred. But, as the law now stands, the appellant is limited to showing that the commission misconstrued the facts actually proved before it, or that it misconstrued the law applicable to such facts, so that the proceeding on appeal no longer looks to a trial analogous to a trial *de novo,* but to a review of the record made before the commission, and on such an appeal the only issues of fact open are the inferences to be drawn from the facts actually proved before the commission. Strictly speaking, therefore, the "burden of proof" provision of the statute cannot mean the same thing when applied to the amended statute as when applied to the original statute, for there can be no burden of proof without the privilege of adducing proof. In the proceeding before the commission, one asserting facts affirmatively either as a claim or a defense necessarily carries the burden of establishing them, and when, as is now the case, the appellate tribunal is limited to a review of the record, it is not apparent how the "burden of proof" provision of the statute can mean anything more than that on appeal it must appear from the record made before the commission that the appellant met, in the proceeding before the commission, that burden by proving facts which should have led to a different conclusion than that reached by it. Or, stated in another way, the question on appeal is whether from the evidence before it the commission should have reached the conclusion it did. In dealing with that question, the primary issue be-

fore the court trying the appeal must be whether there was before the commission any evidence legally sufficient to permit a finding of the controverted fact, and, if such evidence appears, then whether the commission properly construed the fact so found. In such an inquiry it is not apparent how the burden of proof provision of the statute can mean anything more than that one holding the affirmative must prove on appeal, as he must prove before the commission, what he asserts. Otherwise the mere finding of the commission could establish as a fact that which in truth did not exist and of which there was no evidence. So that, where the facts are undisputed or conceded, and susceptible of no inference supporting appellant's contention, or where they are disputed, but, whether proved or not, permit no inference supporting such contention, the question on appeal is one of law unaffected by the burden of proof rule, for it then falls within the reasoning of *Harrison v. Central Construction Co.,* 135 Md. 170, 108 A. 874, and other cases cited in *Hygeia Ice Co. v. Schaeffer,* 152 Md. 234, 136 A. 548; *Beyer v. Decker,* 159 Md. 289, 150 A. 804, and in *States Engineering Company v. Harris,* 157 Md. 488, 146 A. 392. But, as pointed out by Judge Pattison in *Catherman v. Ennis,* 164 Md. 519, 165 A. 482, where the facts proved before the commission are susceptible of a construction supporting the decision of the commission as well as a construction adverse thereto, the appellant on appeal has theoretically the burden of showing that the commission drew the wrong inference, but that is more a rule of logic than of law.

Coming then to the precise question presented by the appeal, the inquiry is whether there was before the commission evidence legally sufficient to permit a finding on appeal that the injury for which compensation is asked arose in the course of and out of claimant's employment and was accidental in its nature.

There was in the case evidence tending to show the following facts, which, while contradicted in some particulars, will for this inquiry be taken as true:

Schemmel, the claimant, was at the time of the injury thirty-four or thirty-five years of age, and prior to it his health had been excellent, although his family physician testified, as the result of his examination, apparently made after the accident, he found Schemmel's blood pressure was higher than normal, but, when he left home to go to work on the day of his injury and indeed when he arrived at the quarry, he appeared to be in fine health and spirits.

The Bush quarry where he was employed is near Churchville in Harford County, and is an excavation about 300 feet long by 80 feet wide, about 100 feet deep on one side and 40 feet deep on the other. Access to the quarry floor was by means of ropes which the employees used in ascending or descending its walls, and by ladders.

In the early morning, before the sun was high enough to shine directly into it, the quarry was somewhat cooler than the outside air, but, as the sun arose higher and its rays struck the rocky sides of the quarry, the absence of ventilation and the reflected heat raised the temperature in the quarry until in the middle of the day it was perhaps ten degrees Fahrenheit above the temperature of the outside air.

In the quarrying operations, in order to loosen it for removal, holes were drilled in the rock and filled with dynamite, which was exploded by a device apparently located outside the quarry. The gases released by such explosions and the dust caused by them make a "sort of a cloud" which hangs over the quarry until it is dissipated by the air, "and it settles." Inhalation of the gases thus released produce circulatory changes in the brain and causes headaches, and it was customary for the workmen not to return to the quarry until an interval of about fifteen minutes had elapsed after an explosion.

The accident occurred on July 1st, 1931, which was intensely hot and "stuffy." The temperature in Baltimore City on that day arose to 101 degrees, in Aberdeen to 97 dedegrees, and in Darlington to 98 degrees, and the temperature at the quarry was about 100 or 101 degrees at 2 o'clock in the afternoon. About fifty or fifty-one men were around

the quarry, and of that number about forty to forty-five were employed in the quarry itself. On the day Schemmel was stricken, four of these men stopped work, and at 2 o'clock the quarry was "closed down" because it was "too hot to work" the men.

Schemmel went to work at the quarry at about 7 o'clock that morning, and in the course of his work descended into the quarry and arranged mud caps on charges of dynamite to be exploded. He made two trips into the quarry, and after his last trip he said that he felt hot, sat down for a while and fanned himself, then started towards "the car" where he "usually went," and shortly after that he was found lying on the ground. He was taken to the office of Dr. Charles Richardson in Bel Air, and from there to his home, where nine or ten days later he was examined by Drs. Charles Bagley, Jr., and Albert L. Wilkinson, who diagnosed his injury as cerebral hemorrhage. Dr. Wilkinson also saw him on the day of the injury after he had been taken to his home, and at that time claimant was partially paralyzed and unconscious. As a result of the consultation, he was removed to the Union Memorial Hospital, where he was operated on by Dr. Bagley. A hole was made in the left temporal region of his skull, a needle introduced into the skull, and the blood which had collected there partially drained. As a result of that and subsequent operations, his condition has slowly improved. At the time of the hearing, he was still "a little below par," although there was apparently some hope of his eventual recovery.

In referring to the cause of the injury, Dr. Wilkinson testified: "That he heard all of the testimony and diagnoses the case as a cerebral hemorrhage, there being several factors entering into the case—the temperature conditions under which the man was working, in his opinion, constituting the provocative cause, the inciting cause—there was several other conditions underlying it—in other words, under normal conditions, this same man probably would not have experienced this hemorrhage and by normal conditions, he means normal working conditions, then, he thinks, claimant would not have

had this hemorrhage—claimant had certain physical conditions existing which, in view of his being subjected to these abnormal conditions, he feels caused the hemorrhage; that he recalls the weather on that day as being an exceedingly hot day—it was the hottest day of the summer and one of the hottest he has ever experienced, not knowing the exact temperature on that day; that he cannot absolutely say that he took claimant's temperature, although it is a routine practice, but he did note his surface temperature as being apparently about normal. Q. Did you diagnose his case as sun stroke or heat prostration? A. * * * Cerebral hemorrhage. And feels that the temperature condition under which claimant worked probably brought on the attack, because it was particularly hot."

Dr. Bagley, who operated on him, said: "Q. What was the cause of that cerebral hemorrhage, doctor? A. His blood escaped from the vessels in his temporal lobe. That after having heard the history of the case, history of claimant's health and all other facts before the Commission, he thinks the hemorrhage was caused—'the man had a hemorrhage from his brain, because of the conditions under which he was working on the morning of July 1st—to begin with he was in the neighborhood of dynamite, which in itself, would produce a headache, the gases which come from it, meaning there is a circulatory change in the brain as a result of the inhalation of this gas——he was under physical exertion climbing up and down a ladder—that he was in the neighborhood of the explosion——in the atmosphere which is filled with gases after an explosion of a large charge of dynamite, which is also known to contain gases which will produce a headache— under all these conditions he was working down in a hole on a very hot day—he came out of the hole complaining of numbness in his face, which obviously marked the beginning of the change in his brain, which went on and formed a large enough clot to produce the complete paralysis of the body, which we removed later."

The evidence as to the time when Schemmel was first stricken is not clear. Schemmel himself said that he had

been in the quarry twice that morning, and that as he came up from the first trip he "felt" his face, although there is nothing in his testimony or elsewhere in the record to explain what he meant by that expression, which he repeated several times, and, when asked what was the mattter with his face, he said he did not know. He may of course have meant that his face was numb, as Dr. Bagley assumed, but there is no evidence that he meant that. While there is testimony to the contrary, there is in the case evidence from which it may rationally be inferred that Schemmel came out of the quarry just before he was stricken, between 10.30 and 11 o'clock A. M., and that prior to that time men had left the quarry because they were unable to work under the extreme weather conditions.

The evidence as to whether Schemmel was exposed to the fumes and gas while in the quarry from exploding dynamite is too vague and unsatisfactory to form the basis of a rational judgment; the only evidence from which such an inference could possibly be drawn being the following statement of Lee Myers, who was at work in the quarry on the day on which Schemmel was stricken: "That he saw claimant up to the time the explosion went off, then we went back in the hole and witness worked in there about fifteen minutes and then he came out, he was the first one to come out, he was too hot—it was very hot, three others being affected the same as he, Davis, Bernie and Jesse Reynolds; that he had a watch in his pocket and he stopped work that day about quarter of ten and did not work any more that day, not until the next, because he got overcome by the heat himself. * * * Q. You worked down there that day? A. Yes, sir; I worked there and we all stopped to shoot—— Q. Then you didn't go back? A. I went back and worked about fifteen minutes longer. Q. And you don't know what day it was? A. I just can't remember what day it was. Q. Did you come out about fifteen minutes after Mr. Schemmel came out? A. I came up first, I was the first one. Q. Then did you come up about fifteen minutes before he went down? A. I was up about an hour before he come down. Q. An hour?

A. Yes, before he come down.  Q. But I mean when he went down to set off the explosion?  A. I come up before he did.  Q. And you didn't see him after that?  A. No, sir."

There was enough in the evidence, however, to support the statement of Dr. Bagley "that he was in the neighborhood of dynamite, which in itself would produce a headache, the gases which come from it," for, while there is nothing in the evidence to permit the inference that there was on the day of the injury more than one explosion, that explosion took place a very short time before Schemmel collapsed, and, while it is doubtful on the evidence whether Schemmel returned into the quarry after the explosion, he may well have been exposed to the gases and dust which hung like a cloud over it.

While, according to the opinions of the physicians, heat was a contributing cause of the injury, it was not classified by them as heat prostration, heat stroke, or sun stroke, but as a hemiplegic cerebral hemorrhage, and the first question to be answered is whether such an injury is accidental within the meaning of that term, as used in the compensation statute (Code, art. 101, sec. 1 *et seq.*, as amended).

The word "accident" in its ordinary and usual implications is associated with ideas of trauma, and involves to a degree at least elements of force, violence and surprise.  But in Workmen's Compensation Law its meaning has been expanded to include any mischance resulting in physical injury to the bodily tissues produced by some unusual and extraordinary condition or happening in the employment.  It has therefore been interpreted to include such untoward occurrences as the rupture of an aneurism, pulmonary and cerebral hemorrhages, hernia, infection, and heart dilation, arising out of some unusual or extraordinary condition in the employment, even where the injury was due in part to pre-existing disease or physical abnormality in the claimant. The many cases in which the question has been considered afford no more definite or sufficient basis for that construction than that the rule is one of policy rather than law, and results from an effort to construe all parts of the statute so as to harmonize them and carry out its general intent.  The

word "accident" or "accidental" is usually considered in connection with the phrase "arising·out of," and, where it seems clear that the injury arose "out of the employment," the tendency of the courts has been to give to the word "accidental" a liberal construction in harmony with the general intent of the act, so as to find the injury compensable. As a result of that policy, such an injury as cerebral hemorrhage, when occasioned by some unusual and extraordinary condition in the employment, is by the great weight of authority held to be accidental in its nature.

In *Patrick v. Ham,* 119 Me. 510, 111 A. 912, the question as to whether such an injury is accidental within the meaning of the statute is elaborately and ably presented both in the majority opinion which holds it accidental, and in the dissenting opinion which denies that construction. The view that it is accidental is supported by *Baggot Co. v. Industrial Commn.,* 290 Ill. 530, 125 N. E. 254, rupture of aorta caused by strain in operating a windlass; *Fowler v. Risedorph Bottling Co.,* 175 App. Div. 224, 161 N. Y. S. 535, cerebral hemorrhage caused by strain; *Crosby v. Thorp, Hawley & Co.,* 206 Mich. 250, 172 N. W. 535, cerebral hemorrhage caused by overexertion; *Johnson v. Torrington,* 3 B. W. C. C. 68, cerebral hemorrhage caused by heat and drinking excessive quantities of water; *La Veck v. Parke, Davis & Co.,* 190 Mich. 604, 157 N. W. 72, cerebral hemorrhage caused by prolonged exertion in a hot room by one suffering from arteriosclerosis; *St. Clair v. Meyer etc.,* 211 Mich 285, 178 N. W. 705, cerebral hemorrhage caused by strain; *Jones Foundry Co. v. Indust. Commn.,* 303 Ill. 410, 135 N. E. 754, cerebral hemorrhage caused by effect of heat and overexertion on one suffering from arteriosclerosis; *Clemens v. Cornish,* 295 Pa. 73, 144 A. 821, cerebral hemorrhage resulting from heat stroke; *Wright v. Louisiana Ice etc. Co.,* 19 La. App. 173, 138 So. 450, cerebral hemorrhage from overexertion; and other cases collected in 7 *A. L. R.* 1614, 13 *A. L. R.* 438, and *A. L. R. Blue Book of Supplemental Decisions.* Nor is it possible on principle to distinguish such an injury from one occasioned by a heat stroke or a sun stroke, which

was held in *State Roads Commission v. Reynolds,* 164 Md. 539, 165 A. 475, to be accidental in its nature. It is no doubt true that, where one suffers from very high blood pressure or a diseased condition of the arteries, the occurrence of such an injury may reasonably be expected as natural and probable under any circumstances, and, when it does occur naturally and as an incident of the disease, while the stroke may be sudden, and the time of its occurrence unexpected, it can hardly be regarded as accidental. But, when it is accelerated by unusual or extraordinary conditions, or is caused by the effect of such conditions on a healthy person, it assumes the character of an accident, since but for such conditions it would not have occurred when it did.

Assuming, therefore, that the injury was accidental in its nature, the final question is whether it arose "out of the employment." In considering that phrase, this court in *Baltimore Dry Docks Co. v. Webster,* 139 Md. 626, 116 A. 842, 846, after a careful examination of the American and English cases, said: "After a very careful examination of many of the cases in which the words 'arising out of and in the course of the employment' have been construed and passed upon, we may add to what has been said that they, as precedents, furnish little aid or assistance in determining the meaning and effects of those words as used in the statute. And after all that has been said, we too are of the opinion that their meaning and effect must be largely determined by considering them in connection with the facts of each particular case." And it cited with apparent approval the statement of Lord Wrenbury in *Herbert v. Fox & Co.* (1916), App. Cas. 405, Ann. Cas. 1916D, 583: "That—'No recent act has provoked a larger amount of litigation than the Workmen's Compensation Act. The few and seemingly simple words "arising out of and in the course of the employment" have been the fruitful (or fruitless) source of a mass of decisions turning upon nice distinctions and supported by refinement so subtle as to leave the mind of the reader in a maze of confusion.' And 'I prefer to go back to the words of the statute, and, guided by certain broad principles which

must be taken to be established, seek to apply those words to the particular case before me.' "

In outlining the scope of the phrase rather than in attempting any comprehensive definition of it, much has been said, but little that is of value added to the statement in *McNicol's Case*, 215 Mass. 497, 102 N. E. 697, that an injury "arises 'out of' the employment, when there is apparent to the rational mind upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workmen would have been equally exposed apart from the employment. The causative danger must be peculiar to the work and not common to the neighborhood. It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequences." See *Baltimore Dry Docks Co. v. Webster, supra; Coastwise Shipbuilding Co. v. Tolson,* 132 Md. 203, 103 A. 478; *Jewel Tea Co. v. Weber,* 132 Md. 178, 103 A. 476; *Bell v. Steen,* 137 Md. 392, 112 A. 584; *Harrison v. Central Construction Co.,* 135 Md. 176, 108 A. 874; *Thistle Mills v. Sparks,* 137 Md. 117, 111 A. 769; *Slacum v. Jolley,* 153 Md. 351, 138 A. 244.

An injury may be said to arise out of the employment when it results from risks or perils peculiar to and inherent in the nature and scope of the work and its obligations (*Schneider, Workmen's Compensation,* sec. 262), but it is only compensable under the act where it is accidental in character. So an occupational or industrial disease resulting

from conditions necessarily incident to the occupation, while it may be said to arise out of the employment, is not compensable, because it is not accidental (*Gunter v. Sharpe & Dohme,* 159 Md. 444, 151 A. 134), while a disease, even though gradual and insidious in its approach, which is caused by casual unexpected conditions in the employment which increase its hazards, but which the employee is not bound to anticipate, not only arises out of the employment but is compensable, because it is accidental. *Victory Sparkler Co. v. Francks,* 147 Md. 379, 128 A. 635; *Atlantic Coast Shipping Co. v. Stasiak,* 158 Md. 349, 148 A. 452; *Cambridge Mfg. Co. v. Johnson,* 160 Md. 260, 153 A. 283; *Miskowiak v. Bethlehem Steel Co.,* 156 Md. 690, 145 A. 199.

Turning to the facts, there was in our opinion evidence legally sufficient to take the case to the jury. Dr. Wilkinson attributed the injury to the effect of the extreme "temperature conditions" under which Schemmel was working upon one suffering from high blood pressure. He characterized the conditions as "abnormal," and the day as one of the "hottest he had ever experienced." Dr. Bagley attributed the injury to the extreme heat and to the inhalation of gases released by dynamite explosions. Dr. Wilkinson said that claimant's blood pressure alone would not have produced the injury had he not been subjected to the extreme temperature conditions under which he worked.

There was other testimony which tended to show that the temperature, inside the quarry where claimant was at work, just before he was stricken was as much as ten degrees higher than the outside air; that the quarry was not ventilated; that in leaving it just prior to his injury he was obliged to climb its sides by the aid of a rope or a ladder; that before he collapsed he fired or caused to be fired the charges of dynamite; that after every such explosion a cloud of dust and gases hung over the quarry; that the temperature outside the quarry was as high as a hundred degrees Fahrenheit at 2 o'clock in the afternoon; that four men other than the claimant stopped work because of the heat; and that at 2 o'clock p. m. the quarry was closed down because it was too

hot to work the men in it, although usually they did not stop operations until 5.30 or 6 o'clock.

Those conditions were peculiar to the employment and not such as affected the public generally in that neighborhood, and, when those facts are considered in connection with the medical testimony, they furnish legally sufficient evidence to permit the inference that claimant's injury was caused by unusual and extraordinary conditions in the employment, that it was accidental in its nature, and that it arose out of and in the course of the employment.

There was therefore error in granting appellees' A, B and C prayers which directed a verdict for the employer and insurer, and the judgment appealed from must be reversed.

*Judgment reversed, and case remanded for a new trial, with costs to the appellant.*

PARKE, J., dissents.