WALTER F. PERDUE, ET AL. *v.* THELMA VIRGINIA BRITTINGHAM

[No. 109, October Term, 1945.]

394

*Decided May 14, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*J. Gilbert Prendergast,* with whom were *W. Edgar Porter* and *Clark, Thomsen & Smith* on the brief for the appellants.

*William W. Travers,* with whom were *Woodcock, Webb, Bounds & Travers* on the brief, for the appellee.

Markell, J., delivered the opinion of the court.

This is an appeal by the employer and the insurer (appellants) in a workman's compensation case. The claimant (appellee) is the widow of the employee, George Robert Brittingham, who was killed on October 23, 1943. The commission's order, affirmed in the lower court, awards the claimant compensation "for the use and benefit of her infant daughter."

The employer carried on business as W. F. Perdue Trucking Company. He operated several trucks. The employee had been employed by him as a truck driver about four months. The employer, the employee and his wife and parents all lived in Wicomico County, east of Salisbury.

The employee was married on July 24, 1943. He left a posthumous daughter, born June 3, 1944. He and his wife lived with his parents. She says that at the time he was killed they were not "living together," but she thinks he would have come back; they first "separated" about three or four weeks after they were married; the cause of their separation was a quarrel; she objected to his drinking; she continued to live with her mother-in-law; she does not know where he was staying; he would come back frequently; they would get into a quarrel, and he would leave. His mother says "he would come home from work, he was tired, and they would fuss * * * like young folks do."

On the evening of October 21, 1943, two of the employer's trucks set out on trips to Philadelphia and back, one driven by the decedent, the other by a driver named Dunham. The employer says "they went along more or less together, but they didn't have to do that." Decedent was hauling "general produce" going up and empty egg cases coming back. Dunham for his return trip had a load of oats for Georgetown, Delaware. The main highway from Salisbury to Wilmington was U. S. Route 13, through Dover (but not through Georgetown). The route from Dover through Georgetown to Salisbury is less direct than Route 13.

The time-clock in decedent's truck indicated that the trip to Philadelphia was begun about 7.15 P. M. (Dunham says eight or nine o'clock) on October 21st and ended at Philadelphia about 3.30 A. M. on the 22d. On the 22d. decedent and Dunham unloaded their trucks and got their return loads at Philadelphia, and that afternoon started on the return trip. The return route, as far as decedent went, was the same as the route going, *viz.*, Route 13. Dunham returned from Dover through Georgetown. The employer says decedent had made several trips to Philadelphia over this route before for him. He thinks decedent knew this road pretty well.

Dunham says they stopped at Wilmington in a restaurant, about 7 or 7.30 on the evening of the 22d., and got something to eat and started on down. At the restaurant decedent "got a beer" while they were having "lunch"; he also "got a beer" on Front Street while Dunham was with him. Apparently just before they came into Wilmington "on the back road," decedent saw that Dunham had a flat tire; they stopped to examine it. They "pulled on down to the next service station and pumped it up." Apparently the service station was south of Wilmington. Dunham thinks they stayed about 45 minutes at the service station and left between 8.00 and 8.30. The time-clock on decedent's truck indicated a stop from 7.05 to 9.05, apparently including the stop at the service station and the "lunch" at the restaurant. Dunham says decedent

was supposed to follow him and help him unload at Georgetown; they had such an understanding. He never saw decedent again. The time-clock indicated that decedent's truck had stopped from 9.20 to 9.30 and finally at 9.40.

Between 10 and 11 o'clock that evening a Delaware State Police Station received a message, presumably by telephone, that there was a man lying alongside a truck, south of Odessa, on the shoulder of the southbound lane of Route 13. Route 13 is a dual highway, separated by a grass plot. The southbound lane itself, approximately 22 feet wide, is in effect two concrete lanes. Odessa is about 25 miles south of Wilmington. This message was investigated by Trooper Callahan, who between 11.00 and 11.15 found the truck, but could not locate the driver. The truck proved to be decedent's truck. It was about a mile and a half south of Odessa. There was a blanket lying alongside the truck; it was picked up and put in the cab of the truck. There was then an unopened case of beer in the cab. Dunham says decedent did not purchase a case of beer along the road coming down from Philadelphia while Dunham was with him. The truck was parked on the shoulder about ten or fifteen feet off the road. Callahan says the lights of the truck were off (or "dimmed" [?]; "we turned them on."

About 1.15 A. M., on October 23d. Harold Allen of Smyrna, Delaware, who worked in Wilmington, was going home, driving his car south on the southbound lane of Route 13. He had several persons with him. He had reached a point about 1.7 miles south of Wilmington— about ten miles north of Smyrna. As he approached he could see something standing in the road—which proved to be Brittingham. "I could not quite make out what it was at first and I looked close over the steering wheel to make out what it was. Of course, I was riding the center of the roadway. [i. e. of the 22 feet southbound lane] and he was standing on the white line in the center of the road with his back to me as I was going south and it looked to me as if he wanted to be hit, with his hands in

front of him and his head down and was not moving. I was pretty close on him before I really knew it was a man." Allen noticed another car running "pretty close in back of me." Allen "cut off to the right of the road on the shoulder and shot around" Brittingham. He had a feeling that the car behind was going to hit Brittingham. Brittingham had not moved even when Allen cut around him. Allen cut across the green and came back to the spot where Brittingham had been standing. The other car had hit him and kept going. When Allen got back there Brittingham had been hit and knocked down "between the center of the dual highway over on the green." He was dead. When Allen first saw him, Brittingham was standing still, not walking, in the middle of the road.

Allen thinks "we told a colored fellow," in a car that had stopped, to call an officer and he went to a place called Royal Oak and did so. The officers arrived about 1.30 A. M. They put a radio message through for the hit-and-run car. The car with its occupants, the owner and the driver, father and son, named Clark, was picked up at Dover, about fifteen miles from the accident. The place where the truck was parked was about a quarter of a mile north of where Brittingham was killed. Callahan says the truck lights were still on; Allen says they were not. Some hours later, when the employer arrived, the battery was dead. Nothing else was found wrong with the car.

The garage nearest the parked truck was at Odessa, about a mile and a half north, probably the only one open at ten o'clock except in Smyrna. The nearest place for liquor or beer was Pleasant Hill Inn, close by where the truck was parked. There is no direct evidence that Brittingham did or did not go to any garage or to any drinking place, or that he was or was not ill or intoxicated, after the truck came to a stop.

Before the claimant filed her claim for compensation, she had instituted two separate suits in Delaware, against the Clarks, under the Delaware Lord Campbell's Act. At the hearing before the commission the employer set up

these suits as an election of remedies which barred any claim for compensation. The claimant offered to assign her interest in the suits to the employer. The employer declined the offer. After notice to the commission, claimant discontinued the suits, before the commission made its order awarding compensation. It is not contended, and there is no evidence, that the employer was actually prejudiced by the institution of these suits. The employer still contends that institution of the suits was an election of remedies which bars any claim for compensation.

Ordinarily it is deemed fundamental that the same person should not pay twice for the same loss, *e. g.*, workmen's compensation and tort liability. *Codley v. John Mowlen & Co., Ltd.*, [1914] 2 K. B. 61. Less fundamental and more narrowly applicable is the doctrine that the same person should not collect twice for the same loss. *Hagerstown v. Schreiner*, 135 Md. 650, 109 A. 464. Still more narrowly applicable are the cases holding that mere institution of a legal proceeding is such a decisive election as bars any other remedy. *Sciacia's Case*, 1928, 262 Mass. 531, 160 N. E. 310; *Tocci's Case*, 269 Mass. 221, 168 N. E. 744; *Graham v. Michigan Motor Freight Lines*, 1943, 304 Mich. 136, 7 N. W. 2d. 246; *Nichols v. Ford Motor Car Co.*, 306 Mich. 268, 10 N. W. 2d. 852. *Cf. Chapman v. Hoage*, 1936, 296 U. S. 526, 80 L. Ed. 370. In any case any of these doctrines may be made applicable or inapplicable by pertinent statutory provisions.

Section 59* of Article 101 of the Code provides that where injury or death was caused under circumstances creating a legal liability in some person other than the employer, the employee or his dependents "may proceed either by law against that other person to recover damages or against the employer for compensation"; and if compensation is paid the employer may enforce for his benefit the liability of such other person, any excess of damages recovered over compensation paid (and expenses and costs) to be paid to the employee or his dependents. *In Hagerstown v. Schreiner, supra*, it was held that after

---

* As renumbered by Chapter 528 of Acts of 1945, Sec. 2.

accepting compensation, dependents could not maintain suit against a third person for damages. The court quoted the provision of section 36 (now 35) that payment of compensation "shall be in lieu of any and all rights of action whatsoever against any person whomsoever." [135 Md. 650, 109 A. 465.] The court said: "We think the plain meaning of section 58 [now 59], so far as concerns the question here involved, is this: If the injury or death has been caused under such circumstances as to fix a legal liability upon some person or persons, other than the employer, the employee, or, in case of his death, his personal representatives or dependents, may elect to sue such other person or persons at law, or may claim compensation under the act, but he or they cannot pursue both remedies. If he or they accept compensation under the act, such payment must be held as declared by section 36, article 101, to be 'in lieu of any and all rights of action whatsoever against any person whomsoever'." *Hagerstown v. Schreiner* was decided January 16, 1920. By Chapter 456 of Acts of 1920 Section 58 was amended by adding the provision that if an employer shall not within two months start proceedings to enforce the liability of the third person, the employee or his dependents may do so for the benefit of the employer and themselves.

Under Vermont and Louisiana statutes substantially similar to the Maryland Act it has been held by the Second Circuit Court of Appeals that after compensation has been awarded but not paid the employee or his dependents may maintain suit against a third person (*Canadian Pacific Railroad Co. v. Morin*, 1931, 54 F. 2d. 246), and by the Supreme Court of Louisiana that after award and payment of compensation suit may be maintained by the employee but credit must be allowed for compensation repayable to the employer. *Lowe v. Morgan's Louisiana & T. R. and S. S. Co.*, 150 La. 29, 90 So. 429.

The Massachusetts and Michigan cases above cited lend considerable color to the appellants' contention in the case at bar. But, as Judge Swan said, "though this difference in the statutes may be thought of slight consequence, the

Massachusetts act provided that the employee may 'at his option' proceed either at law against the tortfeasor to recover damages or against the insurer for compensation under the act, 'but not against both'." *Canadian Pac. R. Co. v. Morin, supra,* 54 F. 2d. 250. In the Massachusetts and Michigan cases the words "but not against both" are stressed. The absence of these words in the Maryland Act is especially significant since the amendment of 1920. That amendment in effect expressly provides that the employee may proceed against both. As so amended, section 59 may enable an employer to escape all liability for either compensation or damages and may impose sole liability on the third person without recourse against the employer for contribution or indemity because of the employer's negligence. *Baltimore Transit Co. v. State, to Use of Schreifer,* 183 Md. 674, 39 A. 2d 858. In *Chapman v. Hoage, supra,* the Supreme Court held that institution of a suit against a third person, and discontinuance after an adverse decision on the merits on appeal, did not bar a claim for compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U. S. C. A. Sec. 901 *et seq.*

We hold that institution and discontinuance of the Delaware suits did not bar a claim for compensation in the instant case. It is therefore necessary to consider appellants' contention that there is no evidence legally sufficient to show that decedent died as the result of an accidental personal injury arising out of and in the course of his employment.

On the question what is an accidental injury arising "out of * * * his employment" (Art. 101, Sec. 14) the decisions of this court do not follow either extreme among the decisions in other jurisdictions. Some American courts have held that these words mean an accident originating, as a proximate cause, the act or event, *e. g.,* a fall, which produces the death or injury. *Baltimore Towage & Lighterage Co. v. Shenton,* 175 Md. 30, 35, 199 A. 806; *Baltimore Dry Docks & Shipbuilding Co. v. Webster,* 139 Md. 616, 623, 116 A. 842. On the other hand, in some

jurisdictions the statute does not require that the injury arise "out of the employment" and in some jurisdictions recent decisions or *dicta* suggest that these words may include practically any injury occurring at the place of the employment. *Hill v. Liberty Motor & Engineering Corp.*, 185 Md. 596, 45 A. 2d. 467, 469, and dissenting opinion; *Hartford Accident & Indemnity Co. v. Cardillo*, 72 App. D. C. 52, 112 F. 2d. 11. This court has not gone to either of these extremes, but has followed English cases, and American case (in Massachusetts, New York and elsewhere) in accord with them.

It must always be shown that the injury arose not only "in the course of [the] employment" but also "out of the employment." *Baltimore Dry Docks Co. v. Webster, supra,* 139 Md. at page 620, 116 A. at page 843. There must be a "casual connnection between the conditions under which the work is required to be performed and the ressulting injury." *Schemmel v. T. B. Gatch & Sons Co.,* 164 Md. 671, 683, 166 A. 39, 43. The casual connection may relate either (a) to the act or event, *e. g., a* fall, which produces the injury or (b) to the consequences of the particular act or event. If there is other evidence that the work causes the act or event, then it is immaterial how usual or trivial the act or event is, or how unusual or abnormal the consequence (*Boetler v. Gardiner-Buick Co.,* 164 Md. 478, 480, 165 A. 611, employee touched another employee's shoulder causing the latter to turn quickly, strike him, throw him off his balance and cause him to fall) or how likely it may be that the same event might occur from any other cause or at any other place. *Townsen Grace Co. v. Ackerman,* 158 Md. 34, 148 A. 122 (slip and fall on a wet floor at work) ; *Unger & Mahon, Inc., v. Lidston,* 177 Md. 265, 9 A. 2d 604, (a fall at the employee's home, caused by pain from a previous injury at work). If, however, there is no apparent casual connection between the work and the event, *e. g.,* a cerebral hemorrhage or an epileptic fit, then unusual or extraordinary conditions of the employment, constituting a risk peculiar to the work, may establish the casual connection

between the work and the injury, either (a) as the unusual cause or acceleration of the event (*Schemmel v. T. B. Gatch & Sons Co., supra,* 164 Md. 681, 682, 166 A. 39, cerebral hemorrhage induced by heat and fumes; *Geipe, Inc., v. Collett,* 172 Md. 165, 190 A. 836, stroke of paralysis to truck driver from shock by fright at traffic accident) or (b) as the cause of the unusual consequences of the event. *Baltimore Towage & Lighterage Co. v. Shenton, supra,* fall from a pier into the water; *Wicks v. Dowell & Co., Ltd.,* [1905] 2 K. B. 225, fall from the deck of a ship into the hold. In such cases the injury arises out of the employment.

In the absence of any such unusual conditions of the employment, death from heart disease at the place of work (*Robertson v. North American Refractories Co.,* 169 Md. 187, 181 A. 223) or from heat prostration after work (*Slacum v. Jolley,* 153 Md. 343, 138 A. 244), or injury from a fall to the floor or the sidewalk during work, from a fit (*Baltimore Towage & Lighterage Co. v. Shenton supra,* 175 Md. 34, 35, 199 A. 806), do not arise out of the employment. Death of a waitress, shot and killed at her work by a co-employee for a reason unrelated to the work, did not arise out of her employment. *Scholtzhauer v. C. & L. Lunch Co.,* 233 N. Y. 12, 134 N. E. 701. Death of a night watchman, murdered at his work for a reason unrelated to the work, did arise out of his employment, because the special danger of his work tends to leave him naked to his enemies. *Todd v. Easton Furniture Mfg. Co.,* 147 Md. 352, 128 A. 42.

A traffic accident, which occurs when a salesman accompanies his credit manager to the street car to finish business with him, arises out of his employment, (*Weston-Dodson Co. v. Carl,* 156 Md. 535, 144 A. 708), but not one which occurs on a pleasure drive (*Matter of Daus v. Gunderman & Son, Inc.,* 283 N. Y 459, 28 N. E. 2d. 914) or on other pleasure bent, even if there is incidental talk about business. *Atlantic Refining Co. v. Forrester,* 180 Md. 517, 25 A. 2d. 667.

In the instant case we may assume, without deciding, (1) that if decedent had been killed while he was asleep beside the truck, it might legitimately have been inferred that his sleep was due to loss of sleep the night before on the trip to Philadelphia; (2) that if, while driving the truck, he had fallen out in front of a passing car, it might have been inferred that the fall was due in part to the driving and also that his death was due to the place of the fall, i. e., the place of his work; (3) that if he had just got out of the truck and was standing beside it, it might be inferred that he had got out to examine the truck or because of some natural need of his own. In each instance the inference would support the conclusion that his death arose out of his employment.

The claimant contends that the commission and the jury might infer that decedent, at the time he was killed, needed help for the truck or himself and was seeking it. We find no evidence to support an inference that he needed, or was seeking, help for the truck or for himself. The truck had not (if that were possible) stopped unexpectedly from battery trouble, but apparently was carefully parked ten or fifteen feet off the road. There is no evidence that he had found battery trouble when he left the truck after his sleep or that he had tried to start the truck and resume his journey; he had left the blanket on the ground. There is no evidence that the battery was dead when the police turned on the lights about eleven o'clock—whether the lights were on or not when decedent was killed. The only evidence of personal needs is that he needed sleep—and got it—and he somewhere sometime got a case of beer but did not consume any of it. If he had had any need, for the truck or himself, the natural way to supply his need would have been through a passing automobile, or by telephone, or by both means. In this way the police were brought first to the parked truck, later to the dead body, and a few minutes later the Clark car was stopped. The fact that he was not more than a quarter of a mile from the parked truck when he was killed does not indicate that he was seeking help, but raises the unanswered

question where he had been in the two or three hours, or more, since he left the truck.

When a truck driver left his truck a thousand yards from Harlem River and later his body was found in the river the New York courts declined to permit inferences that his death had arisen out of his employment, in the absence of evidence to support such inferences. *Donohue v. Yonkers Sash Weight Corporation*, 249 App. Div. 473, 293 N. Y. S. 85, a three-to-two decision unanimously affirmed by the Court of Appeals, 275 N. Y. 566, 11 N. E. 2d. 756. When an employee left his place of employment in Washington "on a little business," cashed a personal check at a bank and was killed crossing the street, the District of Columbia Court of Appeals held that an "inference" that he cashed the check to make a purchase for his employer was pure conjecture, unsupported by evidence. *New Amsterdam Casualty Co. v. Hoage*, 60 App. D. C. 40, 46, F. 2d. 837. See also *Lowe v. Central R. Co. of New Jersey*, 1940, 3 Cir., 113 F 2d. 413, in which a car float watchman was found drowned near car floats, but after his last float had left and before he had been assigned to another.

In *Krell v. Maryland Dry Dock Co.*, 184 Md. 428, 41 A. 2d. 502, the court did not sanction conjecture either as to the cause of the employee's disappearance or as to the casual relation between the employment and the death. There was affirmative evidence that he was so "fenced in" at the war plant that he probably could not have left by land without being seen. Hence the inference that he must have drowned, as in cases of disappearance from a ship at sea. If he was drowned, the fact that his duties required him to be at the water's edge supports the inference that his death arose out of and in the course of his emploment. *Baltimore Towage Co. v. Shenton, supra*.

In the case at bar there is virtually no conflicting evidence except the testimony of Callahan and Allen as to whether the lights were on the truck when decedent was killed. The employer himself, Callahan, Allen and Dunham were called as witnesses by the employer. Their

testimony was substantially uncontradicted (except as to the lights) but perhaps was not all "incontrovertible" and "undisputed." If the commission and the jury chose to "disbelieve" this testimony, then the facts of the case are practically a blank and are no less inadequate to support inferences.

We find no evidence legally sufficient to show that decedent's death arose either "out of his employment" or "in the course of his employment." The employer's motion for a directed verdict on this issue, and his motion for judgment *n. o. v.*, should have been granted. The judgment must be reversed without a new trial.

*Judgment reversed, with costs.*