Mellen *v.* Delaware, Lackawanna and Western Railroad Company, Appellant.

Argued October 29, 1942.

Before

KELLER, P. J., CUNNINGHAM, BALDRIGE, RHODES, HIRT and KENWORTHEY, JJ.

*Gomer W. Morgan,* for appellant.

*Leon M. Levy,* for appellee.

OPINION BY KELLER, P. J., January 28, 1943:

Michael Mellen, an employee of the Delaware, Lackawanna and Western Railroad Company, had his head cut off on February 8, 1937, on his employer's right of way, by a railroad train operated on its tracks. His widow filed a claim on behalf of herself and her five children, all under sixteen years of age, for compensation under the Workmen's Compensation Law of 1915, P. L. 736, and its amendments in force at the date of her husband's death.

The employer filed an answer *denying* (1) that decedent was in its *employ* at the time he met his death; (2) that his death was caused by an *accident* as defined in the Workmen's Compensation Act; (3) the happening of an accident, as defined in said Act, on February 8, 1937. (4) It further denied that at the time of his death decedent was waiting for a work train as stated in paragraph 8 of the claim petition, and averred, on the contrary, that decedent was trespassing upon its tracks, and was either struck by a train while so trespassing or had voluntarily placed himself in such a position that a train would run over him and cause his death; and hence, that while decedent met his death on the *property* of defendant, he was not at the time on its *premises* nor *in the course of his employment* by it.

Boiled down, the defenses were (1) suicide, (2) that the employee's death did not happen in the course of his employment.

The undisputed facts are that Mellen was a car-

penter, employed by the defendant as a car builder and repairman, who had worked for the defendant for at least twelve years at its Keyser Valley Shops, located about four miles from its Hampton Yard (near Taylor Borough) where he met his death. He lived at 1291 Reynolds Avenue, Taylor Borough.

The defendant ran a work train, or shop train, every morning, except Sundays and holidays, from Scranton to its Keyser Valley Shops, for the sole purpose of transporting its employees living in Scranton and intermediate points to its Hampton Yard and to the Keyser Valley Shops. The train carried no other passengers. Its employees were carried free and were not required to have or show any tickets. An agreement with a local labor union required the maintenance and operation of this train. The general work day at the shops began at 7:00 A.M. and lasted until 3:30 P.M. The train usually stopped at the Hampton Yard at about 6:30 to 6:35 A.M. to let off employees working there and pick up employees who worked at the Keyser Valley shops. There was no station, shed or platform provided at the Yard for the employees from Taylor and vicinity who boarded the train there. They had to cross a considerable number of tracks—estimated by one employee, Patrick Gallagher, at twenty-five— before they arrived at the west-bound main track on which the work train ran, and they boarded the train from the right of way spaces between that track and a siding, on the north, and the east-bound track on the south. The decedent's decapitated body was found at 6:25 A.M., at or about the place where the workmen were accustomed to board the work train. The record testimony justifies a finding that this work train was operated for the purpose of transporting its employees, and such transportation was furnished as an inducement to their employment. It had been in operation by the defendant for the transportation of its em-

ployees for twenty-eight years and had been used by the decedent for about twelve years. The testimony was that Mellen usually left his home at six o'clock in the morning, or within five or ten minutes thereafter, and that it took him about fifteen or twenty minutes to walk to the point in the yard where he and his fellow workmen boarded the train. His brother Sam testified that on the morning of February 8, 1937 the deceased left the house at "5-6-7-8-9 minutes before 6 o'clock." It was dark, cold and icy. He took with him his lunch pail, which his ten-year old daughter had packed for him, slung over his shoulder by a cord and carried under his left arm. No witness saw him after that until his body was found about 6:25 A.M., just before the work train pulled into the yard, lying between the east and west bound running tracks, with his head severed and lying within the rails of the west bound track.

There were four trains which regularly used the west bound track in the early morning: (1) Lackawanna Train from Philadelphia to Syracuse which was scheduled to pass the Hampton Yard at about 5:00 A.M. (2) A New York, Ontario & Western freight train which used the Delaware, Lackawanna & Western tracks from Pittston Junction to Cayuga Junction, and was said to have passed Hampton Yard at 6:00 A.M. and arrived at Cayuga Junction, where it left the Delaware, Lackawanna & Western tracks, at 6:05. (3) Lackawanna Train No. 2217, which ran from Port Morris to Hampton Yard by way of Taylor Tank and was said to have arrived at Taylor Tank at 6:00 A.M. The engine was then disconnected from the train, picked up the caboose and proceeded to Hampton Yard. The conductor's testimony was that on February 8th he was all through at Taylor Tank and ready to leave there for Hampton Yard at 6:25 A.M. and that he permitted the work or shop train to go ahead of him

and followed after it; that in passing the Hampton Yard Roundhouse he saw the body lying alongside the tracks as he passed a point near the roundhouse. (4) The work or shop train, which arrived at the Hampton Yard about 6:35 A.M. that morning.

Now, if all the witnesses told the truth and were not mistaken, the decapitation could not have happened. But it did happen. Either Sam Mellen was mistaken as to the time his brother left the house; or it took less than fifteen or twenty minutes for him to walk to the point at the yard where the employees got on the work train; or the train from Philadelphia to Syracuse was late, and arrived at the yard about 6:10-6:20 o'clock; or the New York, Ontario & Western freight train went through the yard at about 6:10-6:15; or No. 2217 preceded the work train and arrived at the yard before 6:25; or, what nobody seems to have suggested or considered, an east bound train may have been run over the west bound track at the Hampton Yard between 6:10 and 6:25 A.M., or some unattached or switching engine may have passed about that time. None of the railroad witnesses produced—or at least offered in evidence—any train records of February 8, 1937. They apparently testified from recollection, although some of them said they had consulted the records. No one connected with any train, who testified as a witness, knew that his train had run over anybody at that point that day. The overwhelming weight of the evidence is that the deceased was not decapitated by the work train; that he had been killed before it arrived. But no one can state definitely and with certainty what train or engine killed him.

The referee, by whom the case was finally heard, found that the claimant's husband was killed by accident; that the defendant had not sufficiently met the burden, imposed on it by section 301 of the Act, of proving that the death was intentionally self-inflicted.

But he found that the decedent was not killed in the course of his employment, because he had been killed before he *boarded* the work train by which his transportation to his place of work would be effected, and his employment by the defendant had not yet begun.

Both parties appealed to the workmen's compensation board. The claimant appealed from the ruling that "the decedent was not in the course of his employment at the time of the fatal accident, because he had not yet boarded the train that was supplied by the defendant to transport him, and [his] employment [by] the defendant had not begun." The defendant appealed (1) from the referee's findings of fact (Nos. 3 and 15) that claimant's husband met his death on February 8, 1937 as the result of an accident; (2) from finding of fact (No. 7) as to the furnishing of transportation to its employees by the work or shop train, as an inducement to employment; and (3) from finding of fact (No. 11) that at the time of his death the decedent was upon the right of way of the Defendant Company at a place where its workmen wait the arrival of the said work train and was struck by the O. & W. freight train which passed Hampton Yards at 6:00 A.M., operating on the main west bound track.

The board sustained the claimant's appeal, modifying finding of fact No. 5, by striking from it the words "and the clothing on his body was orderly, straight, not disturbed and not torn," and substituting therefor, "the decedent's trousers were torn and stained and the heels of his shoes were knocked off"—and made an additional finding of fact, as follows: "16. From the credible evidence in the record, the Board finds as a fact that at the time of his death, the decedent was on the defendant's right of way, where workmen were obliged or directed to wait the arrival of the work train and was struck by a train, being operated on said right of way, while in the course of

his employment with the defendant." It affirmed the other findings of fact of the referee, but substituted for the referee's second, third and fourth conclusions of law the following: "2. The Board concludes as a matter of law that the defendant has failed to establish the statutory burden of proving that the decedent, Michael Mellen, committed suicide.

"3. The Board concludes as a matter of law that since transportation to and from the place of the decedent's employment was supplied by the defendant, the defendant is responsible for compensation to the dependents, because the decedent was in a place where he was obliged or directed to wait in order to be transported to his work."

And they awarded compensation to the widow for herself and children.

The board dismissed defendant's appeal and affirmed the findings of fact challenged by it.

The defendant appealed to this court from the judgment of the lower court affirming the award.

We shall consider the case under two heads: (1) Suicide. (2) Course of Employment.

## I. SUICIDE.

In our opinion the evidence is sufficient to support the board's finding and conclusion of an accidental death rather than suicide. The workmen's compensation law—unlike accident insurance contracts—where the circumstances indicate a violent unnatural death, puts on the employer the burden of proving that it was intentionally self-inflicted (sec. 301). See *Brecker v. P. & R. C. & I. Co.*, 138 Pa. Superior Ct. 421, 425, 10 A. 2d 827. The evidence produced at the first hearing to sustain this burden was very meager. It went no further than (1) to describe the position in which the body was found, and (2) to show that the deceased was disturbed by the conditions at his home, the illness of his wife and her being in a sanitarium and unable

to look after the children, the oldest of whom was twelve years old. As to the former, we refer to the language of Judge HENDERSON, speaking for this court, in *Donovan v. Peoples Natural Gas Co.*, 84 Pa. Superior Ct. 51, 53, (followed in *Finch v. Horn & Hardart*, 94 Pa. Superior Ct. 599, 601, and *Schroeffel v. Great A. & P. Tea Co.*, 132 Pa. Superior Ct. 233, 237, 200 A. 694), "Whatever may be the operation of physical laws as related to inanimate objects, we think it clear that the manner in which a person may fall ...... is not a matter of common knowledge nor subject to the invariable operation of gravitation. The size of the person, the rapidity of movement, and the effort to maintain one's equilibrium, are factors likely to produce unexpected results." If this employee slipped on the icy ground and fell, striking the lower part of the back of his head on the steel rail of the track, rendering him unconscious, his body would naturally relax and might easily be in the position in which he was found. As respects the illness of his wife and his distress and anxiety consequent on her physical condition, such a circumstance is not a rare thing. It is extremely common and it is not, of itself, any evidence of an intent on the part of the husband to commit suicide. But the testimony showed that deceased was always smiling, that he had visited his wife at the sanitarium the day before his death, found her better —she left it shortly thereafter—and he was not depressed in his spirits. The supplementary evidence on this point, taken at the re-opening of the case, is unconvincing to us and evidently was to the referee and the board. The main witness for the defendant at this hearing was a man who had testified at the first hearing and who, apparently, did not then remember or recall the matters to which he later testified, after his recollection had been prodded by his son-in-law, a witness for the defendant and interpreter at the hearing, and

other employees of the defendant. The referee erroneously refused to permit counsel for claimant to interrogate this witness as to what part, if any, employees of the defendant had played in bringing about this revival of recollection. Leading questions are always 'proper on cross-examination and the circumstances were such as to call for the fullest examination into the influences which may have brought about the change of testimony.

But apart from that, the referee and the board evidently placed little credence in the testimony on this point adduced at the second hearing; and neither do we. It certainly was not of a nature or quality to require the board to accept it as true. It was not so clear, positive and credible, nor so uncontradicted or indisputable in weight and amount as to justify a court in holding that a finding against it must be set aside as a matter of law: *Brecker v. P. & R. C. & I. Co.,* supra, p. 425.

## II. COURSE OF EMPLOYMENT.

The evidence fully supports the findings of the referee, approved by the board, that the defendant operated its work train solely for the free transportation of its employees to its Hampton Yard and Keyser Valley Shops, and as an inducement to such employment. The testimony is too full and clear to require discussion. The mere fact that employees who were minded to do so and were willing to pay the expense themselves, could travel by trolley to the Keyser Valley Shops, does not affect the validity of this finding. The sole difference between the referee and the board was as to when the relation of employer and employee began as to those employees who were accustomed to use the transportation facilities furnished by the defendant. Was it after the employee had boarded the train? Or when he came to the particular place on defendant's premises where the employee was directed

by it to board the train? In the circumstances of this case, we think he was in the course of his employment when he came to the place on defendant's premises where he was directed to board the work train, even though his pay did not begin until he arrived at the shops: *Persing v. Citizens Traction Co.*, 294 Pa. 230, 235, 144 A. 97; provided his coming there was not an unreasonable time before the usual arrival of the work train. It must be borne in mind that the place appointed for the employee to be was not a building in which he was to go to work; it was an open space of ground on defendant's right of way to which a movable train would come, not on an exact hour and minute but varying from five to ten minutes; that to get to it employees from Taylor Borough would have to cross many tracks in the yard and consequently had to be there long enough ahead to be sure to be on time, for if late, the train would go without them. There is no exact testimony as to when Mellen arrived there that morning. The finding of the referee that he was struck by the O. & W. freight train which passed Hampton Yard at 6:00 o'clock, in view of the later finding of the board (16th finding) must be understood as referring to the approximate time of passage rather than the exact time.

In any event, we think in the peculiar circumstances of this case, it was for the board to find whether his arrival at the place fixed by the defendant for boarding the work train was a reasonable time before the expected coming of the train and having, in effect, found it was, we are not required to rule that its finding was without support in the evidence.

We think this conclusion is supported in principle by the following cases: *Bock v. Reading,* 120 Pa. Superior Ct. 468, 472-474, 182 A. 732; *Knorr v. Central R. R. of N. J.,* 268 Pa. 172, 175, 110 A. 797; *Nilsson v. Nepi Bros.,* 138 Pa. Superior Ct. 107, 112-113, 9 A. 2d

912; *Dunn v. Trego,* 279 Pa. 518, 124 A. 174; *Garratt v. McCrady Const. Co.,* 114 Pa. Superior Ct. 579, 174 A. 808; *Hall v. Bessemer & L. E. R. R. Co.,* 36 Pa. Superior Ct. 556, 560; *Reese v. Penna. R. R. Co.,* 118 Pa. Superior Ct. 112, 180 A. 188; *Mease v. Reading Co.,* 126 Pa. Superior Ct. 436, 444, 191 A. 402.

In *Flanagan v. Webster & Webster,* 107 Conn. 502, 142 A. 201, 203, the Supreme Court of Connecticut held that an employee was in the course of his employment although he had not yet boarded the automobile on which transportation would be furnished him, saying: "If the employee went to the designated place within a reasonable time prior to the time he was to board the automobile, he would from the time he reached the designated place, be then carrying out the direction of his employer, and that direction would become an incident of the employment and part of the means of transportation, just as a railway station, or a bus waiting room, is a necessary incident of the transportation of the passengers of the railway or bus line." And in *Fisher v. Tidewater Bldg. Co.,* 96 N. J. Law 103, 114 A. 150, and *Harrison v. Central Const. Corp.,* 135 Md. 170, 108 A. 874 and 112 A. 627, the employee was held to be in the course of employment when he was hurt *while boarding* the train furnished by his employer for his transportation. See also, *Voehl v. Indemnity Ins. Co.,* 288 U. S. 162, 169, 170; *Cudahy Packing Co. v. Parramore,* 263 U. S. 418, 423.

The Pennsylvania cases relied upon by the appellant and by the referee which held that an employee who was hurt *while riding to and from his work* on means of transportation furnished by the employer, as a part of or an inducement to his employment, was within the course of his employment, were all cases where the accident happened while the employee was actually traveling; but the discussions in the Knorr case and the Bock case, we think, show that it was not thereby

intended to rule that there could not be circumstances which might bring the employee within the course of his employment while waiting a reasonable time at the place fixed or designated by the employer until the provided means of transportation arrived.

The assignments of error are overruled and the judgment is affirmed.